1  HILGERS GRABEN PLLC
   Michael Merriman, Cal. Bar No. 234663
2  mmerriman@hilgersgraben.com
   655 West Broadway, Suite 900
3  San Diego, CA 92101
   Telephone: (619) 369-6232
4
   *Counsel for the Plaintiffs*
5  *and the Proposed Classes*

6  [Additional counsel on signature page]

7

8              **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF CALIFORNIA**
9

10 | DR. DERRICK ADAMS AND CAPE | No. 2:23-CV-01773-DJC-JDP |
   | EMERGENCY PHYSICIANS, P.A., on behalf | |
11 | of themselves and those similarly situated, | **AMENDED CLASS ACTION** |
   | | **COMPLAINT FOR VIOLATIONS OF** |
12 | Plaintiffs, | |
   | | **(I) THE SHERMAN ACT,** |
13 | | **15 U.S.C. § 1, ET SEQ., AND** |
   | v. | |
14 | | **(II) THE CARTWRIGHT ACT, CAL.** |
   | | **BUS. & PROF. CODE § 16720, ET** |
15 | EXPERIAN INFORMATION SOLUTIONS, | **SEQ.** |
   | INC., EQUIFAX INC., AND TRANSUNION, | |
16 | | **DEMAND FOR JURY TRIAL** |
   | Defendants. | |
17

18

19        Plaintiffs Dr. Derrick Adams and Cape Emergency Physicians, P.A., on behalf of

20 themselves and all those similarly situated, bring this action against Defendants Experian

21 Information Solutions, Inc. ("Experian"), Equifax Inc. ("Equifax"), and TransUnion

22 ("TransUnion") (collectively, the "Three Credit Reporting Agencies") for violations of the

23 Sherman Antitrust Act and California's Cartwright Act.

24        Plaintiffs, on behalf of themselves and all those similarly situated, demand a trial by

25 jury on all counts for which a right to trial by jury is allowed and allege as follows in support

26 of this Amended Class Action Complaint:

27

28

                              - 1 -          AM. CLASS ACTION COMPLAINT
                                             2:23-CV-01773-DJC-JDP

**JURISDICTION**

1.    Plaintiffs' claims arise under Sherman Act Section 1 (15 U.S.C. § 1). Plaintiffs seek damages and injunctive relief under Clayton Act Sections 4 and 16 (15 U.S.C. §§ 15, 26). Dr. Adams also asserts a claim under the Cartwright Act (Cal. Bus. & Prof. Code § 16750), for which he seeks damages and injunctive relief.

2.    This Court has subject-matter jurisdiction over Plaintiffs' Sherman Act claim under 15 U.S.C. § 15, because the claim arises from injuries Plaintiffs suffered by reason of conduct forbidden in the antitrust laws; under 28 U.S.C. § 1331, because the claim arises under the laws of the United States; and under 28 U.S.C. § 1337(a), because the claim arises under an Act of Congress regulating commerce or protecting trade and commerce against restraints of trade. This Court has supplemental jurisdiction of the state law claim under 28 U.S.C. § 1367(a).

3.    This Court has personal jurisdiction over each of the Defendants because each of the Defendants: performed the trade that was illegally restrained in this State, including in this District; transacted business in this State, including in this District; had substantial contacts within this State, including in this District; and/or were engaged in an unlawful restraint of trade which injured persons residing in, located in, and doing business in this State, including in this District.

**NATURE OF THE ACTION**

4.    In very public fashion, the Three Credit Reporting Agencies announced a formal agreement among themselves to restrain trade by refusing to report unpaid medical bills under $500 on consumer credit reports. Indeed, it is rare to see such a transparent conspiracy. While the Defendants celebrated their joint action as benefitting patients, this reporting-amount conspiracy represents a categorical violation of the Sherman Act and the Cartwright Act, and its imposition not only illegally restrains trade, but will also diminish access to medical care by driving providers out of certain markets.

5.    The Three Credit Reporting Agencies also agreed to extend the time that *any* amount of unpaid medical debt must be delinquent before it can be reported on a consumer

credit report, from 180 to 365 days. This reporting-timing conspiracy, which became effective on July 1, 2022, also represents a categorical violation of the Sherman Act and the Cartwright Act because it illegally restrains trade.

6. The Three Credit Reporting Agencies' conspiracy to devalue the quality of their credit reports, through the reporting-amount conspiracy and reporting-timing conspiracy, targets medical providers and has inevitably harmed them. Medical providers now have a more costly path to collect payment on unpaid medical bills, if they can feasibly collect at all. Defendants' conduct also places individual medical providers, such as Plaintiffs, at a severe financial disadvantage compared to larger and more expensive medical practices, such as hospitals.

7. Medical providers submit information about unpaid medical bills to credit reporting agencies in what had been a mutually beneficial transaction: credit reporting agencies received information about unpaid debts, which made their reports more valuable to those purchasing the credit reports, and medical providers received help persuading patients to pay their medical bills, by virtue of patients' desire to avoid the negative impact of having unpaid medical bills on their credit reports.

8. Experian, Equifax, and TransUnion could have continued competing in terms of the value of their service to medical practices by deciding independently what information to report on consumer credit reports, and when.

9. Instead, the Three Credit Reporting Agencies have conspired to restrain competition in this market by agreeing not to report unpaid medical debts under $500 on consumer credit reports, and not to report any medical debt until it has been delinquent a year. Defendants' services in the relevant market are now equally devalued to medical providers such as Plaintiffs.

10. The market Defendants have restrained has a massive economic footprint. The U.S. Consumer Financial Protection Bureau ("CFPB") estimated an "outstanding balance of about *$88 billion in medical debt collections* on consumer credit reports" as

1    of 2021.[1] The CFPB also has "estimate[d] that *22.8 million people will have at least one*

2    *medical collection removed* from their credit reports when all medical collections less

3    than $500 are removed."[2]

4          11.    There are more than one million active physicians in the United States, along

5    with numerous other medical providers of different types. Their unpaid bills under $500

6    have been removed from consumer credit reports and will no longer be reported by the

7    Three Credit Reporting Agencies.

8          12.    There are only three significant credit reporting agencies who participate in

9    the market for receiving medical-debt information for purposes of reporting it on consumer

10   credit reports: Experian, Equifax, and TransUnion. All three agreed, and issued a *joint* press

11   release to announce, that they would be removing, and no longer reporting, medical debts

12   under $500.

13         13.    This conspiracy violates Section 1 of the Sherman Act and Section 16720 of

14   the Cartwright Act.

15         14.    Plaintiffs and many thousands of other medical providers have suffered

16   losses as a direct and proximate result of Defendants' unlawful conduct and are entitled to

17   relief including actual damages, treble damages, equitable relief, and reasonable attorneys'

18   fees and costs.

19                            **VENUE**

20         15.    Venue is proper in this District pursuant to Section 12 of the Clayton Act

21   (codified at 15 U.S.C. § 22) and 28 U.S.C. § 1391(b)–(d) because a substantial part of the

22   events giving rise to Dr. Adams's claims occurred in this District, a substantial portion of

23   the affected interstate trade and commerce has been carried out in this District, and one or

24

---

25   [1] CFPB, *Medical Debt Burden in the United States* 6 n.10 (Feb. 2022) (emphasis added),
26   https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_medical-debt-burden-in-the-united-states_report_2022-03.pdf.
     [2] CFPB, *Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports* 2 (Apr.
27   2023) (emphasis added),
     https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_consumer-credit-removal-
28   medical-collections-from-credit-reports_2023-04.pdf.

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1    more of the Defendants is licensed to do business in, has agents in, or is found to transact

2    business in, this District.

3                                          **PARTIES**

4           16.     Plaintiff Dr. Derrick Adams resides in Placer County, California. He works

5    and has an ownership share in the medical practice Twelve Bridges Dermatology, located

6    at 2295 Fieldstone Drive, Suite 150, Lincoln, CA 95648. By contract, Dr. Adams is entitled

7    to a set percentage of the money received by Twelve Bridges Dermatology for the medical

8    services Dr. Adams performs at Twelve Bridges Dermatology, and is separately entitled to

9    a set percentage of the practice's profits.

10          17.     Plaintiff Cape Emergency Physicians, P.A. is a New Jersey professional

11   corporation with its principal place of business in Cape May Court House, New Jersey.

12          18.     Defendant Experian Information Solutions, Inc. is an Ohio corporation with

13   its principal place of business in Costa Mesa, California.

14          19.     Defendant Equifax Inc. is a Georgia corporation with its principal place of

15   business in Atlanta, Georgia. Equifax Inc. is a holding company of the credit reporting

16   agency Equifax Information Services LLC, which is an entity formed in Georgia.

17          20.     Defendant TransUnion is a Delaware corporation with its principal place of

18   business in Chicago, Illinois.

19          21.     All conditions precedent to the bringing of this action have occurred, or

20   Defendants have waived them.

21                                  **FACTUAL BACKGROUND**

22   **Dr. Adams's Medical Practice**

23          22.     Plaintiff Dr. Adams is the sole doctor in a medical practice in the small city

24   of Lincoln, California, near Sacramento. He specializes in dermatology, in which he

25   completed his residency and received certification from the American Academy of

26   Dermatology and the American Osteopathic College of Dermatology. Before his residency,

27   he served in the U.S. Air Force as a Captain and General Medical Officer at the David Grant

28   Medical Center, Travis Air Force Base in Fairfield, California.

23.    Dr. Adams's current practice, called Twelve Bridges Dermatology, opened in April 2022. He diagnoses and treats skin cancer, psoriasis, eczema, acne, autoimmune disorders, and other skin conditions. Dr. Adams is the Medical Officer of Twelve Bridges Dermatology and has management authority over the operations of Twelve Bridges Dermatology.

**Cape Emergency Physicians' Medical Practice**

24.    Plaintiff Cape Emergency Physicians is a professional corporation that provides emergency medicine services in New Jersey.

**How Plaintiffs' Medical Practices Bill Patients and Collect Unpaid Bills**

25.    Plaintiffs' practices send a bill to each patient, after treating them, for the portion of the cost for which the patient is financially responsible after insurance is applied. A substantial number of bills that Plaintiffs' practices have sent to patients, and will continue to send, are for an amount under $500.

26.    Plaintiffs' practices have sent bills for amounts under $500, and more, that have not yet been paid. This lack of payment has resulted in financial injury to Cape Emergency Physicians. This lack of payment has also resulted in financial injury to Dr. Adams because he receives a set percentage of the money received by Twelve Bridges Dermatology for the medical services Dr. Adams performs at Twelve Bridges Dermatology, and Dr. Adams is separately entitled to a set percentage of the practice's profits.

27.    Thousands of other medical practices have sent bills to millions of patients for an amount under $500 that remain unpaid. The CFPB "estimate[d] that 22.8 million people will have at least one medical collection removed from their credit reports when all medical collections less than $500 are removed."[3]

28.    If patients do not pay their bills, Plaintiffs' practices use third-party accounts-receivable services as their agents to attempt to collect the unpaid bills.

---

[3] CFPB, *Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports* 2 (Apr. 2023), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_consumer-credit-removal-medical-collections-from-credit-reports_2023-04.pdf.

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

29.     Accounts-receivable services, as one of their options for incentivizing patients to pay their bills, report unpaid medical bills to credit reporting agencies. Based on information and belief, accounts-receivable services have reported unpaid medical bills from Plaintiffs' practices to the Three Credit Reporting Agencies.

30.     Thousands of other medical practices in California and across the United States follow a similar practice of using accounts-receivable services to collect unpaid bills, and those accounts-receivable services report unpaid medical bills to the Three Credit Reporting Agencies.

31.     Historically, the risk that an unpaid medical bill under $500 was, or could be, reported on a consumer's credit report incentivized the patient to pay the bill. Patients understood that an unpaid bill listed on their credit report harmed their credit score, which in turn reduced their access to credit, increased their costs to obtain that credit, and decreased options for other financial transactions such as leasing a car.

32.     The Three Credit Reporting Agencies recognize they wield this power, and are aware of the resulting value of their reporting services to medical providers like Plaintiffs and other members of the proposed classes. For example, Equifax states on its website, "Reporting loans to the CRAs can help incentivize stronger payment performance. Since consumers today understand that their payment behavior on loans reported to the CRA[]s matters. This often drives them to pay those loans on time vs. delaying or not paying those that are not reported to their credit file."[4]

33.     Plaintiffs intend, and prefer, that accounts-receivable services, who work as their agents, continue to report their patients' unpaid bills to the Three Credit Reporting Agencies. But currently the reporting of unpaid medical bills under $500 is rendered pointless because, according to the conspiracy, the Three Credit Reporting Agencies have agreed not to include such unpaid bills in consumer credit reports. And the Three Credit

---

[4] Bob Hofmann, *Major Benefits of Credit Reporting for Both Consumers and Lenders* (Feb. 28, 2023) (emphasis removed), https://www.equifax.com/business/blog/-/insight/article/major-benefits-of-credit-reporting-for-both-consumers-and-lenders/.

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1  Reporting Agencies have instructed accounts-receivable services not to report unpaid

2  medical bills of $500 or more until they are delinquent for 365 days.

3  **The Conspiracy by the Three Credit Reporting Agencies**

4      34.    On March 18, 2022, the Three Credit Reporting Agencies jointly announced

5  via press release the following "joint measures":

> The three nationwide credit reporting agencies (NCRAs) – Equifax (NYSE: EFX), Experian (LON: EXPN), and TransUnion (NYSE: TRU) – today announced significant changes to medical collection debt reporting to support consumers faced with unexpected medical bills. These joint measures will remove nearly 70% of medical collection debt tradelines from consumer credit reports, a step taken after months of industry research.

> . . . .

> Effective July 1, 2022, . . . the time period before unpaid medical collection debt would appear on a consumer's report will be increased from 6 months to one year, giving consumers more time to work with insurance and/or healthcare providers to address their debt before it is reported on their credit file. In the first half of 2023, Equifax, Experian and TransUnion will also no longer include medical collection debt under at least $500 on credit reports.

> The companies' CEOs provided a joint statement on the decision to change medical collection debt reporting:

> "Medical collections debt often arises from unforeseen medical circumstances. These changes are another step we're taking together to help people across the United States focus on their financial and personal wellbeing," said Mark W. Begor, CEO Equifax; Brian Cassin, CEO Experian; and Chris Cartwright, CEO TransUnion. "As an industry we remain committed to helping drive fair and affordable access to credit for all consumers."

> For more information, please visit: Equifax, Experian, and TransUnion.[5]

---

[5] PR Newswire, *Equifax, Experian, and TransUnion Support U.S. Consumers With Changes to Medical Collection Debt Reporting* (Mar. 18, 2022), https://www.prnewswire.com/news-releases/equifax-experian-and-transunion-support-us-consumers-with-changes-to-medical-collection-debt-reporting-301505822.html.

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

35.     The announcement was widely publicized, including nationwide by the federal government. For example, in April 2022, the CFPB reported that "Equifax, Experian, and TransUnion issued a joint statement to announce . . . . that starting in July 2023, they will not include information furnished to them for medical bills in collection for amounts of $500 or less."[6]

36.     After the announcement, in March 2022 the Three Credit Reporting Agencies jointly instructed those who provided medical debt information to them: "Do not report Medical Debt collection accounts . . . until they are at least 365 days past the Date of the First Delinquency with the original creditor that led to the account being sold or placed for collection."[7] The same written instructions also included: "Do not report Medical Debt collection accounts . . . under a pre-defined minimum threshold (will be at least $500 and published later this year)."[8]

37.     On April 11, 2023, the Three Credit Reporting Agencies jointly announced via press release that they had effectuated their joint commitment from 2022 not to report medical collection debt under $500:

> Equifax® (NYSE: EFX), Experian (LON:EXPN), and TransUnion (NYSE:TRU) are jointly announcing that medical collection debt with an initial reported balance of under $500 has been removed from U.S. consumer credit reports. With this change, now nearly 70 percent of the total medical collection debt tradelines reported to the Nationwide Credit Reporting Agencies (NCRAs) are removed from consumer credit files. This change reflects a commitment made by the NCRAs last year.
>
> "Our industry plays an important role in the financial lives of consumers. We understand that medical debt is generally not taken on voluntarily and we are committed to continuously evolving credit reporting to support greater and responsible access to credit and mainstream financial services," said Mark W. Begor, CEO Equifax;

---

[6] CFPB, *Know your rights and protections when it comes to medical bills and collections* (Apr. 11, 2022), https://www.consumerfinance.gov/about-us/blog/know-your-rights-and-protections-when-it-comes-to-medical-bills-and-collections/.

[7] Equifax, Experian, & TransUnion, *To All Collections Data Furnishers* (Mar. 2022), https://www.acainternational.org/wp-content/uploads/2022/03/Medical-Collections-Furnisher-Communication-March-2022-002.pdf.

[8] *Id.*

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

Brian Cassin, CEO Experian; and Chris Cartwright, CEO TransUnion. "We believe that the removal of medical collection debt with an initial reported balance of under $500 from U.S. consumer credit reports will have a positive impact on people's personal and financial well-being."

The NCRAs previously announced that as of July 1, 2022, . . . [t]he time period before unpaid medical collection debt appears on a consumer's credit report was also increased from six months to one year, giving consumers more time to address their debt before it is reported on their credit file.[9]

38.     The Three Credit Reporting Agencies have removed unpaid medical debt under $500 from consumer credit reports, and stopped reporting it. The Three Credit Reporting Agencies also no longer report any unpaid medical debt until it has been delinquent at least 365 days. This joint action was widely reported to the public, including by the federal government.[10]

39.     Before this joint action, the Three Credit Reporting Agencies could have chosen independently (1) whether to include, and how to account for, medical debts under $500 in the consumer credit reports they each publish, and (2) when to begin reporting unpaid medical bills.

40.     Because the Three Credit Reporting Agencies conspired together to stop reporting medical debts under $500 or less than 365-days delinquent, consumer credit reports from all three of these agencies have lost value to medical providers like Plaintiffs.

41.     The Three Credit Reporting Agencies are the only significant participants in the market for receiving medical debt information for the purpose of reporting it on consumer credit reports. Plaintiffs have no feasible alternative to provide information about

---

[9] PR Newswire, *Equifax, Experian and TransUnion Remove Medical Collections Debt Under $500 From U.S. Credit Reports* (Apr. 11, 2023), https://www.prnewswire.com/news-releases/equifax-experian-and-transunion-remove-medical-collections-debt-under-500-from-us-credit-reports-301793769.html.

[10] CFPB, *Have medical debt? Anything already paid or under $500 should no longer be on your credit report* (May 8, 2023), https://www.consumerfinance.gov/about-us/blog/medical-debt-anything-already-paid-or-under-500-should-no-longer-be-on-your-credit-report/#:~:text=The%20three%20nationwide%20credit%20reporting,all%20medical%20collections%20under%20%24500.

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1    unpaid medical bills under $500 for the purpose of including them on consumer credit

2    reports.

3        42.    If one of the Three Credit Reporting Agencies had decided to stop reporting

4    medical debts under $500, or decided to report unpaid medical bills later than another

5    agency, Plaintiffs could have chosen to provide information to the other two agencies for

6    the purpose of reporting medical debts owed to them. Instead, the Three Credit Reporting

7    Agencies made it safe for themselves—but anticompetitive for the market—by jointly

8    deciding what medical debts to report and when.

9        **Anticompetitive Effect of the Reporting-Amount Conspiracy**

10       43.    The reporting-amount conspiracy has the anticompetitive effect of removing

11   the Three Credit Reporting Agencies' competition on whether and how to report unpaid

12   medical bills under $500. Before this conspiracy the Defendants had competed in this

13   respect. For example, TransUnion stated in a 2018 court filing that the Three Credit

14   Reporting Agencies "compete with one another to provide the most comprehensive, timely,

15   and accurate information on consumers' financial behavior."[11] And TransUnion's former

16   chief executive officer testified to Congress in 2019 that the Three Credit Reporting

17   Agencies "are competing for the ability to actually provide the best information on a

18   consumer as possible."[12] The reporting-amount conspiracy reduced this competition with

19   respect to medical debt. This reduction in competition devalues the quality of the service

20   the Three Credit Reporting Agencies had provided to Plaintiffs and other medical providers.

21       44.    The monetary effect of the reporting-amount conspiracy has been and will

22   be massive, and will ripple through the Unites States for years to come.

23       45.    Plaintiffs' practices have issued, and will continue to issue, many bills under

24   $500. Based on information, belief, and common-sense logic, patients have paid fewer of

25

26   [11] Trans Union LLC's Redacted Counterclaims, *Fair Isacc Corp. v. TransUnion, LLC*, No. 17-cv-8318, Doc. 38 at 6 (N.D. Ill. Feb. 12, 2018).

27   [12] *Who's Keeping Score? Holding Credit Bureaus Accountable and Repairing a Broken System*, Hearing Before the H. Comm. on Fin. Servs., 116th Cong. 1 (Feb. 26, 2019) (statement by James Peck, TransUnion

28   CEO), https://www.govinfo.gov/content/pkg/CHRG-116hhrg35632/html/CHRG-116hhrg35632.htm.

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1    their bills under $500 because patients know those unpaid bills will not be reported on their

2    credit reports, and patients will continue to pay fewer of their bills under $500 for the same

3    reason. As Equifax's website explains in the similar context of loans, reporting an unpaid

4    loan on a credit report "often drives [consumers] to pay those loans on time vs. delaying or

5    not paying those that are not reported to their credit file."[13] Therefore, Defendants'

6    conspiracy has devalued the quality of their services by removing an important incentive for

7    patients to pay medical providers, including Plaintiffs.

8         46.    After announcement of Defendants' reporting-amount conspiracy,

9    numerous patients have stated publicly on social media that they will not pay their medical

10   bills of less than $500. Additionally, a company that assists in collecting medical debts has

11   reported, "Anecdotally, we've had patients share with our team that since healthcare debts

12   can no longer be listed on their credit report, they are no longer even due and do not need

13   to be paid."[14]

14        47.    Since announcement of Defendants' reporting-amount conspiracy, Dr.

15   Adams is aware that multiple patients of his practice have not paid their unpaid medical

16   bills or even responded to the bills. Based on information and belief, this is because those

17   patients are aware that their medical debt less than $500 will not be reported on their credit

18   reports.

19        48.    The scope of monetary effect from the conspiracy is massive. The

20   conspiracy not to report medical debt under $500 will affect the repayment of tens of

21   millions of medical bills. CFPB "estimate[d] that 22.8 million people will have at least one

22   medical collection removed from their credit reports when all medical collections less than

23   $500 are removed."[15] Using the CFPB's estimate, if each of the 22.8 million people had

---

[13] Bob Hofmann, *Major Benefits of Credit Reporting for Both Consumers and Lenders* (Feb. 28, 2023) (emphasis removed), https://www.equifax.com/business/blog/-/insight/article/major-benefits-of-credit-reporting-for-both-consumers-and-lenders/.

[14] State Collection Service, Inc., *Impact of Credit Reporting Changes* (last visited Nov. 8, 2023), https://www.statecollectionservice.com/news/impact-of-credit-reporting-changes/.

[15] CFPB, *Data Point: Consumer Credit and the Removal of Medical Collections from Credit Reports* 2 (Apr. 2023), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_consumer-credit-removal-medical-collections-from-credit-reports_2023-04.pdf.

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1    just one unpaid medical bill that averaged $100, the conspiracy would affect $2.28 billion

2    in money owed to medical providers.

3          49.     The effect is likely much larger. As the Washington Post has reported about

4    Defendants' decision not to report unpaid medical bills: "To grasp why this removal is so

5    important, you have to understand the gravity of these small-dollar debts. It's not just one

6    bill under $500. People are often receiving multiple bills from different health-care

7    providers."[16] The CFPB has estimated a total "outstanding balance of about $88 billion in

8    medical debt collections on consumer credit reports," based on data from 2021, and the

9    CFPB identified another study that estimated an outstanding balance of $140 billion.[17]

10         50.     Defendants' reporting-amount conspiracy harms medical providers. By not

11   reporting unpaid medical bills on consumer credit reports, the Three Credit Reporting

12   Agencies have eliminated a valuable tool that medical providers use to incentivize patients

13   to pay their bills. Without this tool, medical providers must resort to costlier methods to

14   receive payment of their bills, such as employing additional time of in-house staff and third-

15   party accounts-receivable services. These costlier methods have not succeeded, and will

16   not succeed, in achieving the same rate of payment. Because of Defendants' conspiracy,

17   patients no longer have the incentive to avoid unpaid medical bills appearing and remaining

18   on their credit reports. Defendants have not agreed to remove from credit reports the

19   unpaid bills for any other types of debt, such as car payments, home improvement, credit

20   cards, or conspicuous consumption. Rather, Defendants intentionally have targeted

21   medical providers.

22         51.     Dr. Adams's medical practice, like that of many medical providers, is a small

23   business. He frequently performs services that cost patients less than $500 out of pocket.

24

25

---

26   [16] Michelle Singletary, *Finally, medical debt under $500 has been removed from credit reports* (Apr. 12, 2023), https://www.washingtonpost.com/business/2023/04/12/medical-debt-credit-reports/.

27   [17] CFPB, *Medical Debt Burden in the United States* 6 n.10 (Feb. 2022),
     https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_medical-debt-burden-in-the-united-states_report_2022-03.pdf.

28

The conspiracy has a significant effect on his business, as a trade association's letter to the Three Credit Reporting Agencies warned:

> It is worth noting that these are the doctors who most rely on third-party debt collectors to recover the rightfully owed money for services they provided because they do not have the infrastructure for in-house collections. The amounts they collect often represent whether the doctor makes a profit or incurs a loss in running his or her business, including employing others. It might be possible for one bill for less than $500 to be written-off by a small Provider, but dozens of bills for this amount could take away from significant operational costs at a practice. Most Providers are just that: Providers, and not sophisticated financial institutions like banks. These are small businesses providing compassionate care to their community and this change will cause further lack of recourse to be paid for their services.[18]

52.     Defendants' reporting-amount conspiracy has harmed Plaintiffs and other medical providers by devaluing the benefit of the transaction between medical providers and credit reporting agencies. Plaintiffs now receive no benefit from the Three Credit Reporting Agencies in return for providing information about unpaid medical bills under $500. That reduction in the quality of the service is an existing, and ongoing, injury. And that reduction in quality has resulted in less payment of medical bills, based on information and belief. Plaintiffs and other medical providers now receive less payment of medical bills and have a costlier path to collect payment on unpaid medical bills, if they can feasibly collect at all. Additionally, since the conspiracy the staff at Twelve Bridges Dermatology now spend much more time than before explaining to patients what their financial responsibility will be, in an effort to promote payment by the patients. This extra time has the cost and harm of diverting the staff from other tasks that could benefit the practice, improve its services, and increase its profits.

---

[18] *See, e.g.*, Letter from Scott Purcell, CEO, ACA Int'l, to Mark Begor, CEO, Equifax, *et al.* (Mar. 23, 2022), https://www.acainternational.org/wp-content/uploads/2022/03/ACA-Letter-to-CRAs-Final-1.pdf.

**Anticompetitive Effect of the Reporting-Timing Conspiracy**

53.    The reporting-timing conspiracy has the anticompetitive effect of removing the Three Credit Reporting Agencies' competition regarding *when* to report unpaid medical bills. The Three Credit Reporting Agencies had "compete[d] with one another to provide the most comprehensive, *timely*, and accurate information on consumers' financial behavior," according to a court filing by TransUnion in 2018.[19] The reporting-timing conspiracy reduced this competition with respect to medical debt. This reduction in competition devalues the quality of the service the Three Credit Reporting Agencies had each provided to Plaintiffs and other medical providers. That reduction in the quality of the service is an existing, and ongoing, injury. And that reduction in quality has resulted in less payment of medical bills and delays in payment that eventually occur, based on information and belief.

54.    The monetary effect of the reporting-timing conspiracy has been and will be massive. This conspiracy applies to any unpaid medical bills, including those over $500.

55.    Based on information and belief, Plaintiffs and other medical practices have received, and will continue to receive, less payment of medical bills because those bills are not reported on credit reports until at least 365 days after delinquency. Defendants' agreed delay in reporting unpaid medical debts reduces or eliminates the time that patients can see a medical debt on their credit report and still seek health-insurance payment. For example, some patients wait to pay a medical bill until a credit report informs them of the amount still due. That notice, and the desire to remove the medical debt from their credit report, incentivizes the patient to contact their health-insurance provider to determine if insurance should cover some of the medical bill (or more of it than originally paid). The timing problem Defendants have created is that some health-insurance providers require claims to be filed within 365 days from service. Therefore, payments that would have been made by health-insurance providers have not, and will not, be made because the claim was not made in time. Insurance providers' refusal to pay after 365 days leaves the patient with

---

[19] Trans Union LLC's Redacted Counterclaims, *Fair Isacc Corp. v. TransUnion, LLC*, No. 17-cv-8318, Doc. 38 at 6 (N.D. Ill. Feb. 12, 2018) (emphasis added).

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1  more of the bill to pay, which foreseeably results in some of those patients not paying their

2  medical bills.[20]

3       56.     Even if a patient eventually pays the full amount of an unpaid medical bill

4  after it is reported on the patient's credit report, the reporting-timing conspiracy caused,

5  and continues to cause, a delay in that payment. That is a financial harm to Plaintiffs and

6  other medical providers.

7       **Harms to Patients and Society from Defendants' Conspiracy**

8       57.     In addition to the harm to Plaintiffs and other medical providers, Defendants'

9  conspiracy causes significant harms to society.

10       58.     Although Defendants jointly announced their conspiracy as a positive

11  development for patients, a profound *harm* to patients will ripple out from this conspiracy:

12  limited access to medical care. The harder it is for medical providers to recover unpaid bills,

13  the more likely the resulting financial difficulties will force medical providers to stop

14  providing service in locations where patients are less likely to pay. This will

15  disproportionately affect lower-income patients. As one trade association warned the

16  Three Credit Reporting Agencies:

17  > If [medical providers] cannot collect on their accounts and
18  > therefore incur ongoing losses that take away from running their
   > business, they will not be able to provide these important services
19  > to our communities. . . . Basic economic principles make clear that
   > low-income Americans will be harmed most when Providers
20  > constrict services, leading to higher costs and less access to
21  > medical care for all consumers.[21]

22       59.     Defendants' conspiracy also harms lenders. Defendants' credit reports are

23  less valuable to potential lenders now that they do not timely disclose all of consumers'

24  unpaid debts. The Three Credit Reporting Agencies could have continued competing for

25  lenders' business by reporting the most thorough information each could obtain about

26  consumers' unpaid debts. Instead, the Three Credit Reporting Agencies eliminated that

27  _____

28  [20] *See supra* Letter from Scott Purcell, CEO, ACA Int'l (explaining effects of delaying reporting time).
   [21] *Id.*

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1  competition as to medical debt under $500, equally devaluing their products, by conspiring

2  jointly not to report that specific category and magnitude of debts. This further supports that

3  Defendants' joint action, which harms medical providers, did not flow from altruism but

4  from protectionism.

5  **RELEVANT MARKET**

6      60.    This lawsuit concerns one relevant market: the market for providing and

7  receiving medical-debt information for the purpose of reporting it on consumer credit

8  reports. Medical providers, such as Plaintiffs, conduct a transaction with credit reporting

9  agencies to provide medical-debt information in return for the agencies' reporting it on

10  consumer credit reports. The relevant market does not include information about non-

11  medical debts.

12      61.    The geographic scope of the relevant market is the United States. Each

13  Defendant is involved in the relevant market throughout the United States, including across

14  California.

15      62.    Medical providers in the United States, including in California, have provided

16  information about unpaid medical bills to credit reporting agencies in what had been a

17  mutually beneficial transaction: Credit reporting agencies received information about

18  unpaid debts, which made their reports more valuable to those purchasing the credit

19  reports, and medical providers received help incentivizing patients to pay their medical

20  bills, which came from patients' desire to avoid the negative impact on their credit report of

21  having unpaid medical bills.

22      63.    There are only three significant credit reporting agencies who participate in

23  the market for providing and receiving medical-debt information for purposes of reporting it

24  on consumer credit reports: Experian, Equifax, and TransUnion.

25      64.    Experian, Equifax, and TransUnion jointly referred to themselves as "[t]he

26  three nationwide credit reporting agencies (NCRAs)" in the press release announcing the

27

28

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1  conspiracy.[22] TransUnion has stated in a court filing that Equifax and Experian are its "two

2  major competitors."[23] And each Defendant's website identifies only the three Defendants

3  when referring to credit reporting agencies.[24]

4      65.    The federal government has recognized that Defendants "play an outsized

5  role in Americans' economic lives," noting that they "cover more than 1.6 billion credit

6  accounts for over 200 million adults every month."[25] The CFPB identifies only Defendants

7  when it identifies the Nationwide Consumer Reporting Agencies ("NCRAs").[26] Similarly, the

8  federal government's public website about credit reports lists only the three Defendants as

9  "the three credit reporting agencies."[27] That website provides a hyperlink to

10  AnnualCreditReport.com, "the only website authorized by the federal government to issue

11  free, annual credit reports from the three CRAs." AnnualCreditReport.com prominently

12  states on its homepage that it is "brought to you" by Experian, Equifax, and TransUnion.[28]

13      66.    Members of Congress have recognized that the credit reporting industry is

14  an "oligopoly" controlled by Defendants and have lamented the lack of competition in the

15

16  —————————————

17  [22] Business Wire, *Equifax, Experian, and TransUnion Support U.S. Consumers With Changes to Medical Collection Debt Reporting* (Mar. 18, 2022),

18  https://www.businesswire.com/news/home/20220318005244/en/Equifax-Experian-and-TransUnion-Support-U.S.-Consumers-With-Changes-to-Medical-Collection-Debt-Reporting.

19  [23] Trans Union LLC's Redacted Counterclaims, *Fair Isacc Corp. v. TransUnion, LLC*, No. 17-cv-8318, Doc. 38 at 15 (N.D. Ill. Feb. 12, 2018).

20  [24] *See* Equifax, https://www.equifax.com/personal/education/credit/score/ ("the three nationwide credit reporting agencies, Equifax®, Experian®, and TransUnion®"); Experian, https://www.experian.com/consumer-products/experian-equifax-transunion-credit-report-and-score.html ("the three credit bureaus . . . Experian,

21  Equifax®, and TransUnion®"); TransUnion, https://www.transunion.com/credit-reporting-agencies ("There are three credit agencies: TransUnion, Equifax, and Experian.").

22  [25] Karen Andre, *Report illustrates how the big three credit reporting companies are giving consumers the runaround*, CFPB (Feb. 11, 2022), https://www.consumerfinance.gov/about-us/blog/report-illustrates-

23  how-big-three-credit-reporting-companies-are-giving-consumers-the-runaround/.

24  [26] CFPB, *Annual report of credit and consumer reporting complaints, an analysis of complaint responses by Equifax, Experian, and TransUnion* 3 (Jan. 2022),

25  https://files.consumerfinance.gov/f/documents/cfpb_fcra-611-e_report_2022-01.pdf; CFPB, *Annual report of credit and consumer reporting complaints, an analysis of complaint responses by Equifax,

26  Experian, and TransUnion* (Jan. 2023), https://files.consumerfinance.gov/f/documents/cfpb_fcra-611-e_report_2023-01.pdf.

27  [27] USA.gov, *Learn about your credit report and how to get a copy* (last updated May 25, 2023), https://www.usa.gov/credit-reports.

28  [28] Annual Credit Report.com (Last Visited Aug. 15, 2023), https://www.annualcreditreport.com/index.action.

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1  market.[29] During a 2019 hearing before the House Financial Services Committee,

2  lawmakers expressed concern to Defendants' CEOs, who appeared as witnesses, about

3  eliminating negative information from credit reports. In response, TransUnion's then-CEO

4  James Peck "admitted that there could be 'unintended consequences' with eliminating

5  certain data from credit reports and scores."[30]

6          67.     As the only NCRAs, Defendants are the only significant participants in the

7  market for medical debt information for the purpose of reporting it on consumer credit

8  reports. There are no other credit reporting agencies to which medical providers can

9  feasibly turn with their information about unpaid medical bills under $500. And this

10  transaction with the Three Credit Reporting Agencies was a far more cost-effective option

11  for medical providers to incentivize payment of unpaid bills than any other available

12  method, such as additional attempts to communicate with patients or legal action.

13  Therefore, no service besides what the Three Credit Reporting Agencies have offered is a

14  reasonable substitute for what the Three Credit Reporting Agencies have restrained with

15  their conspiracy. Medical providers like Plaintiffs are now suffering the consequences of

16  Defendants' conspiracy to devalue the quality of their transaction with medical providers,

17  which in turn reduces the quality of Defendants' credit reports.

18                          **CLASS REPRESENTATION ALLEGATIONS**

19          68.     Plaintiffs bring their claims against Defendants on behalf of similarly situated

20  persons under Fed. R. Civ. P. 23(a) and 23(b)(3), and seek certification of the classes

21  defined as follows:

22          69.     **Reporting-Amount Conspiracy Nationwide Class**: For Count I (violation of

23  the Sherman Act), Plaintiffs propose that the Reporting-Amount Conspiracy Nationwide

24  Class be defined as follows: all providers of medical services in the United States who have

25  uncollected bills under $500 for medical-related services. The class period begins at least

26

27  [29] Neil Haggerty, *House banking panel bemoans credit bureaus' 'oligopoly'* (Feb. 26, 2019),
   https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=407266.

28  [30] *Id.*

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

1    as early April 11, 2023, the date Defendants announced they had implemented their

2    reporting-amount conspiracy by removing from consumer credit reports any medical

3    collection debt with a balance of under $500.

4         70.    **Reporting-Amount Conspiracy California Class**: For Count II (violation of

5    California's Cartwright Act), Dr. Adams proposes that the Reporting-Amount Conspiracy

6    California Class be defined as follows: all providers of medical services in California who

7    have uncollected bills under $500 for medical-related services. The class period begins at

8    least as early April 11, 2023, the date Defendants announced they had implemented their

9    reporting-amount conspiracy by removing from consumer credit reports any medical

10   collection debt with a balance of under $500.

11        71.    **Reporting-Timing Conspiracy Nationwide Class**: For Count I (violation of

12   the Sherman Act), Plaintiffs propose that the Reporting-Timing Conspiracy Nationwide

13   Class be defined as follows: all providers of medical services in the United States who

14   would have had an unpaid medical bill appear earlier on a consumer credit report but for

15   Defendants' reporting-timing conspiracy, and that unpaid medical bill has not been paid in

16   full or was not paid in full until it was reported on one of Defendant's credit reports after

17   being delinquent for at least 365 days.

18        72.    **Reporting-Timing Conspiracy California Class**: For Count II (violation of

19   the Cartwright Act), Dr. Adams proposes that the Reporting-Timing Conspiracy California

20   Class be defined as follows: all providers of medical services in California who would have

21   had an unpaid medical bill appear earlier on a consumer credit report but for Defendants'

22   reporting-timing conspiracy, and that unpaid medical bill has not been paid in full or was

23   not paid in full until it was reported on one of Defendant's credit reports after being

24   delinquent for at least 365 days.

25        73.    Plaintiffs reserve the right to amend these definitions as discovery proceeds

26   and to conform to the evidence.

27

28

74.    Excluded from the Classes are Defendants, their agents, representatives, and employees; any judge to whom this action is assigned; and any member of that judge's staff and immediate family.

75.    While the exact number of members of the Nationwide Classes is unknown at this time, based on information and belief, in the United States there are just over one million licensed physicians,[31] more than 200,000 professionally active dentists,[32] more than 45,000 doctors of optometry,[33] and more than 70,000 chiropractors.[34] These medical providers, and other types of medical providers affected by Defendants' conspiracy, are potential members of the Nationwide Classes.

76.    While the exact number of members of the California Classes is unknown at this time, based on information and belief, in California there at least 120,000 physicians with active California licenses who practice in the state,[35] more than 30,000 professionally active dentists,[36] almost 7,000 doctors of optometry,[37] and more than 12,000 chiropractors.[38] These medical providers, and other types of medical providers in California who were affected by Defendants' conspiracy, are potential members of the California Classes.

---

[31] Aaron Young et al., *FSMB Census of Licensed Physicians in the United States, 2020*, Vol. 107 No. 2 J. Medical Regulation 57 (2021), https://www.fsmb.org/siteassets/advocacy/publications/2020-physician-census.pdf.

[32] Am. Dental Ass'n, *U.S. Dentist Demographic Dashboard* (2022), https://www.ada.org/resources/research/health-policy-institute/us-dentist-demographics.

[33] Health Policy Institute, *County Data Demonstrates Eye Care Access Nationwide* (Apr. 2018), https://www.aoa.org/AOA/Documents/Advocacy/HPI/County%20Data%20Demonstrates%20Eye%20Care%20Access%20Nationwide.pdf.

[34] Am. Chiropractic Ass'n, *Key Facts and Figures About the Chiropractic Profession*, https://www.acatoday.org/news-publications/newsroom/key-facts.

[35] Janet Coffman & Margaret Fix, *The State of California's Physician Workforce* (June 2021), https://www.ucop.edu/uc-health/_files/prop-56/annual-review-report-june2021.pdf [sic].

[36] Nat'l Library of Medicine, *Health, United States, 2019 [Internet] Table 42* (2020), https://www.ncbi.nlm.nih.gov/books/NBK569311/table/ch3.tab42/.

[37] Healthforce Ctr. at UCSF, *Optometry Workforce and Education in California* (July 31, 2020), https://healthforce.ucsf.edu/sites/healthforce.ucsf.edu/files/publication-pdf/Optometry%20Workforce%20and%20Education%20in%20California.pdf.

[38] Bram B. Briggance, *Chiropractic Care in California* (2003), https://healthforce.ucsf.edu/sites/healthforce.ucsf.edu/files/publication-pdf/5.%202003-06_Chiropractic_Care_in_California.pdf.

77.     Because the potential members of the Nationwide Classes and of the California Classes (collectively, the "Class Members") are so numerous, individual joinder of these members is impracticable.

78.     The Class Members will be ascertainable through discovery including Defendants' data and other records.

79.     There are common questions of law and fact shared by Plaintiffs and each Class Member. The common questions of law and fact include the following:

        a.  whether Defendants entered an agreement which restrained competition;

        b.  whether the agreement is unlawful;

        c.  whether Defendants' conduct injured medical providers; and

        d.  the appropriate nature of class-wide injunctive or other equitable relief.

80.     Certification of the Classes under Fed. R. Civ. P. 23(a) and 23(b)(3) is appropriate as to the members of the putative classes in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. All Class Members were subject to the same conduct by Defendants, as such conduct was announced jointly by Defendants as their standard business practice to be applied consistently nationwide.

81.     A class action will cause an orderly and expeditious administration of claims by the members of the Classes, will foster economies of time, effort, and expenses, and will ensure uniformity of decisions.

82.     Plaintiffs' claims are typical of the claims of the Classes pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) because they are based on and arise out of identical facts constituting the wrongful conduct of Defendants.

83.     Plaintiffs are adequate representative of the Classes because their interests do not conflict with the interests of other class members, and they will fairly and adequately protect the class members' interests. Additionally, Plaintiffs are cognizant of their responsibility as class representatives and they have retained experienced counsel fully

1  capable of, and intent upon, vigorously pursuing the action. Plaintiffs' counsel has extensive
2  experience in class action litigation.

3      84.    The Class Members have suffered the same or similar injury as Plaintiffs,
4  including actual damages.

5                          **COUNT I**

6          **VIOLATIONS OF THE SHERMAN ANTITRUST ACT,**
7              **15 U.S.C. § 1, *ET SEQ.***

8      85.    Plaintiffs re-allege and incorporate by reference each and every allegation
9  set forth in paragraphs 1–84 as if fully set forth herein.

10     86.    This claim is brought against all Defendants by Plaintiffs individually and on
11 behalf of the Nationwide Classes.

12     87.    Defendants entered into and engaged in unlawful concerted action that
13 unreasonably restrained trade in violation of Section 1 of the Sherman Act (codified at 15
14 U.S.C. § 1).

15     88.    Defendants agreed not to report unpaid medical bills under $500 on
16 consumer credit reports, and not to report other unpaid medical bills until they have been
17 delinquent 365 days.

18     89.    Defendants' agreement restrained trade in the market for providing and
19 receiving medical-debt information for the purpose of reporting it on consumer credit
20 reports. Defendants no longer compete between themselves as to whether to include, and
21 how to account for, medical debts under $500 on the consumer credit reports they each
22 publish, or as to how soon to report unpaid medical debts. Defendants' agreement
23 devalues, in an equal way, the quality of the service that the Defendants had each provided
24 to Dr. Adams and other medical providers.

25     90.    Defendants' agreement constitutes a *per se* violation of the Sherman Act,
26 and is violation of the Sherman Act according to the Rule of Reason.

27
28

AM. CLASS ACTION COMPLAINT
2:23-CV-01773-DJC-JDP

91.    Defendants' agreement intentionally, directly, and proximately caused the reduction in value of the service that Defendants had each provided to Plaintiffs and other medical providers: reporting unpaid medical bills under $500 on consumer credit reports, and reporting other unpaid medical bills sooner than 365 days after becoming delinquent. Defendants' agreement similarly caused—intentionally, directly and proximately—a reduction in the number of medical bills that Plaintiffs were able to collect, and will be able to collect, increases Plaintiffs' costs to attempt to collect payment of such bills, and delays payment of the bills that patients do eventually pay. Plaintiffs seek damages in an amount to be proven at trial under Section 4 of the Clayton Act (codified at 15 U.S.C. § 15), on behalf of themselves and the Nationwide Classes.

92.    Defendants' services are transacted in interstate commerce. Defendants engaged in conduct inside the United States that caused direct, substantial, intentional, and reasonably foreseeable anticompetitive effects upon interstate commerce within the United States. The activities of Defendants were within the flow of interstate commerce of the United States and these activities were intended to have, and did have, a substantial effect on interstate commerce of the United States.

93.    The restrained trade affects interstate commerce for several reasons, including because patients will pay fewer medical bills, medical providers such as Plaintiffs will receive payment of fewer medical bills and incur increased costs to collect payment of medical bills, and the transaction of services between Plaintiffs' practice and the Three Credit Reporting Agencies spans state lines. Dr. Adams's practice is located in California, Cape Emergency Physicians treats patients in New Jersey, and Defendants have nationwide operations. In addition, Equifax's principal place of business is in Georgia and TransUnion's principal place of business is in Illinois.

94.    There are no procompetitive benefits of Defendants' agreement, nor was there a legitimate or sufficient business justification. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

95.     Plaintiffs' and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

96.     Each Defendant is jointly and severally liable for the harm caused by its conduct from the time they announced their conspiracy to the present.

### COUNT II

### VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16720, *ET SEQ*.

97.     Dr. Adams re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–96 as if fully set forth herein.

98.     This claim is brought against all Defendants by Dr. Adams individually and on behalf of the California Classes.

99.     Defendants entered into and engaged in unlawful concerted action that unreasonably restrained trade in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*

100.     Defendants agreed not to report unpaid medical bills under $500 on consumer credit reports, and not to report other unpaid medical bills until they have been delinquent 365 days.

101.     Defendants' agreement restrained trade in the market for providing and receiving medical-debt information for the purpose of reporting it on consumer credit reports. Defendants no longer compete between themselves as to whether to include, and how to account for, medical debts under $500 on the consumer credit reports they each publish, or as to how soon to report unpaid medical debts. Defendants' agreement devalues, in an equal way, the service that the Defendants had each provided to Dr. Adams and other medical providers.

102.     Defendants' agreement constitutes a *per se* violation of the Cartwright Act, and is a violation of the Cartwright Act according to the Rule of Reason.

103.    There are no procompetitive benefits of Defendants' agreement, nor was there a legitimate or sufficient business justification. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

104.    Defendants' agreement intentionally, directly and proximately caused the reduction in value of the service that Defendants had each provided to Dr. Adams and other medical providers: reporting unpaid medical bills under $500 on consumer credit reports, and reporting other unpaid medical bills sooner than 365 days after becoming delinquent. Defendants' agreement similarly caused—intentionally, directly and proximately—a reduction in the number of medical bills that Dr. Adams was able to collect, and will be able to collect, increases Dr. Adams's costs to attempt to collect payment of such bills, and delays payment of the bills that patients do eventually pay. Dr. Adams seeks damages in an amount to be proven at trial, on behalf of himself and the California Classes.

105.    Dr. Adams's and Class Members' injuries are of the type the Cartwright Act was designed to prevent, and flow from that which makes Defendants' conduct unlawful.

106.    Each Defendant is jointly and severally liable for the harm caused by its conduct from the time they announced their conspiracy to the present.

## **PRAYER FOR RELIEF**

Plaintiffs and the Class Members seek the following relief:

 a.   Certification of the Classes;

 b.   Declaration that Defendants' conduct violated the Sherman Act and Cartwright Act.

 c.   Award Plaintiffs and the Class Members treble damages for the injuries they suffered as a result of Defendants' unlawful conduct;

 d.   Award Plaintiffs and Class Members their costs of suit, including reasonable attorneys' fees and expenses;

 e.   Order that Defendants, their directors, officers, parents, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner,

1    directly or indirectly, committing any additional violations of the law as

2    alleged herein; and

3         f.    Such other relief as the Court deems just and proper.

4    **<u>DEMAND FOR JURY TRIAL</u>**

5    Plaintiffs respectfully demand a trial by jury on all issues that can be tried to a jury.

6

7    Date: November 22, 2023                          Respectfully submitted,

8

9    */s/ Michael Merriman*
     Michael Merriman (SBN 234663)
     HILGERS GRABEN PLLC
10   655 West Broadway, Suite 900
     San Diego, CA 92101
11   Telephone: 619.369.6232
     mmerriman@hilgersgraben.com
12
     Bennett Rawicki (*pro hac vice*)
13   HILGERS GRABEN PLLC
     7859 Walnut Hill Lane, Suite 335
14   Dallas, TX 75230
     Telephone: 469.640.6842
15   brawicki@hilgersgraben.com

16   *Counsel for the Plaintiffs and*
     *the Proposed Classes*
17

18

19

20

21

22

23

24

25

26

27

28

AM. CLASS ACTION COMPLAINT
                                               2:23-CV-01773-DJC-JDP