1
2
3
4
5
6
7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DR. DERRICK ADAMS and CAPE              No. 2:23-cv-01773-DJC-MJ
     EMERGENCY PHYSICIANS P.A., on
12   behalf of himself and those similarly
     situated,
13
                                             ORDER GRANTING MOTION TO
14            Plaintiffs,                     DISMISS WITH LEAVE TO AMEND

15       v.

16   EXPERIAN INFORMATION
     SOLUTIONS, INC., et. al.,
17
18            Defendants.

19

20        Plaintiffs Doctor Derrick Adams and Cape Emergency Physicians, P.A. ("Cape")

21   bring this putative class action complaint against Defendants Experian Information

22   Solutions, Inc., Equifax Inc., and TransUnion, alleging that they illegally combined

23   together to restrain trade by agreeing to no longer report medical debt less than

24   $500 and to not report medical debt until 365 days have passed.  Plaintiffs argue that

25   this "Agreement" violates both federal and state antitrust laws.  As discussed below,

26   while Plaintiffs have Article III standing to bring suit, they fail to make the more

27   rigorous showing that they have antitrust standing under federal law.  Therefore, the

28   Court will dismiss Count One of the Amended Class Action Complaint, which brings a

                                          1

federal claim under the Clayton Act, with leave to amend.  As for Count Two, which brings a state law claim under California's Cartwright Act, the Court declines to exercise supplemental jurisdiction over it under 28 U.S.C. Section 1367(c)(3), although Plaintiffs may reallege it in the event that they reassert their federal claim in a Second Amended Class Action Complaint.

Accordingly, for the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss (ECF No. 48) as to Count One but DENIES as moot the Motion as to Count Two.  Plaintiffs are granted leave to amend if they so choose.

## BACKGROUND

### I.    Factual Background

#### A.    The Parties

The two Plaintiffs seek to represent medical service providers across the nation. (*See* Am. Class Action Compl. (ECF No. 43) ¶¶ 68–84 ("Amended Complaint" or "AC") (providing the class allegations).)  Each represents a different portion of the market.

Cape Emergency Physicians, P.A. is a New Jersey corporation domiciled there. (*See* AC ¶ 17.)  Cape provides emergency medical services.  (*See id.* ¶ 24.)  Doctor Derrick Adams is the sole doctor in a medical practice in the small city of Lincoln, California, near Sacramento.  (AC ¶ 22.)  Adams is a dermatologist who describes his practice, "like that of many medical providers, [a]s a small business."  (*Id.* ¶ 51.) Adams "frequently performs services that cost patients less than $500 out of pocket." (*Id.*)  That $500 threshold is significant because the three largest credit reporting agencies, Defendants, agreed to no longer report unpaid medical debt that was less than $500.  (*See id.* ¶¶ 4–5.)  At base, Adams complains that he, like other medical service providers who are solo- or small-scale practitioners, faces increased costs trying to collect outstanding payments that will push him out of the market.  (*See id.* ¶¶ 6, 52, 58 (citation omitted); *also id.* at 51 (citation omitted).)

Defendants Experian, Equifax, and TransUnion are known as the "Three Credit Reporting Agencies" or "CRAs."  (*See* AC ¶¶ 18–20; *e.g., id.* ¶¶ 4, 32.)  Defendants are

1    recognized as the only significant actors in the credit reporting industry, which makes

2    the industry an oligopoly and gives them substantial control over an important part of

3    the economy.  (*See id.* ¶¶ 63–67.)

4        **B.    The Product or Service and the Market**

5        Plaintiffs allege that there is "one relevant market: the market for providing and

6    receiving medical-debt information for the purpose of reporting it on consumer credit

7    reports." (AC ¶ 60.)  "Medical providers, such as Plaintiffs, [allegedly] conduct a

8    transaction with [the CRAs] to provide medical-debt information in return for the

9    [CRAs] reporting it on consumer credit reports." (*Id.*)  "Medical providers submit

10   information about unpaid medical bills to [the CRAs] in what had been a mutually

11   beneficial transaction[.]" (*Id.* ¶ 7.)  The CRAs "received information about unpaid

12   debts, which made their reports more valuable to those purchasing the credit reports,

13   and medical providers received help persuading patients to pay their medical bills, by

14   virtue of patients' desire to avoid the negative impact of having unpaid medical bills

15   on their credit reports." (*Id.*)  The relevant market spans the United States and does

16   not include information about non-medical debts.  (AC ¶¶ 60–61.)

17       **C.    The Defendants' Agreement**

18       This case revolves around two alleged conspiracies that form Defendants'

19   "Agreement:" (1) the "reporting-amount conspiracy" and (2) the "reporting-timing

20   conspiracy." (*See* AC ¶¶ 4–5.)  In the "reporting-amount conspiracy," Plaintiffs allege

21   that the CRAs "announced a formal agreement among themselves to restrain trade by

22   refusing to report unpaid medical bills under $500 on consumer credit reports."

23   (*Id.* ¶ 4.)  In the "reporting-timing conspiracy," Plaintiffs allege that the CRAs "agreed

24   to extend the time that *any* amount of unpaid medical debt must be delinquent

25   before it can be reported on a consumer credit report, from 180 to 365 days."

26   (*Id.* ¶ 5.)

27       In March 2022, the CRAs announced via press release the "joint measures"

28   covering the conspiracies.  (AC ¶ 34 (citation omitted).)  Later, the CRAs "jointly

1   instructed those who provided medical debt information to them: 'Do no report

2   Medical Debt collection accounts . . . until they are at least 365 days past the Date of

3   the First Delinquency with the original creditor . . . .'" (*Id.* ¶ 36 (citation omitted).)

4   Those instructions also stated: "Do not report Medical Debt collection

5   accounts . . . under a pre-defined minimum threshold (will be at least $500 and

6   published later this year)." (*Id.*)  Finally, in April 2023, the CRAs "jointly announced via

7   press release that they had effectuated their joint commitment from 2022 not to

8   report medical debt under $500[.]" (*Id.* ¶ 37 (citation omitted).)

9          **D.    The Alleged Harm from the Agreement**

10          Plaintiffs complain that a "substantial number of bills that Plaintiffs' practices

11   have sent to patients, and will continue to send, are for an amount under $500."

12   (AC ¶ 25.)  "If patients do not pay their bills, Plaintiffs' practices [allegedly] use third-

13   party accounts-receivable services as their agents to attempt to collect the unpaid

14   bills." (*Id.* ¶ 28.)  "Accounts-receivable, as one of their options for incentivizing

15   patients to pay their bills, report unpaid medical bills to [the CRAs]." (*Id.* ¶ 29.)

16   "Plaintiffs intend, and prefer, that accounts-receivable services, who [allegedly] work

17   as [Plaintiffs'] agents, continue to report their patients' unpaid bills to the [CRAs]."

18   (*Id.* ¶ 33.)  However, Plaintiffs allege that doing so is now pointless because of the

19   Agreement. (*See id.*)

20          Plaintiffs allege that the reporting-amount conspiracy harms medical service

21   providers because reporting unpaid medical debt was a "valuable tool that medical

22   providers use to incentivize patients to pay their bills." (AC ¶ 50.)  Without this tool for

23   debt less than $500, Plaintiffs allege that they "must resort to costlier methods to

24   receive payment of their bills, such as employing additional time of in-house staff and

25   third-party accounts-receivable services." (*Id.*)  As a result, Plaintiffs complain that they

26   "now receive less payment of medical bills and have a costlier path to collect payment

27   on unpaid medical bills, if they can feasibly collect at all." (*Id.* ¶ 52.)

28   ////

1    Plaintiffs also allege that "Defendants' agreed delay in reporting unpaid

2  medical debts reduces or eliminates the time that patients can see a medical debt on

3  their credit report and still seek health-insurance payment." (AC ¶ 55.) Plaintiffs

4  explain that "some patients wait to pay a medical bill until a credit report informs them

5  of the amount still due." (*Id.*) That notice, and the desire to remove the medical debt

6  from their credit report, incentivizes the patient to contact their health-insurance

7  provider to determine if insurance should cover some of the medical bill (or more of it

8  than originally paid). (*Id.*) But some health-insurance providers require claims to be

9  filed within 365 days of service, which means that if patients do not see the debt on

10  their credit report until after the 365-day waiting period, there will be some cases in

11  which the health-insurance provider pays less than they should or even nothing. (*See*

12  *id.*) As a result, "[i]nsurance providers' refusal to pay after 365 days leaves the patients

13  with more of the bill to pay, which foreseeably results in some of those patients not

14  paying their medical bills." (*Id.* (citing ACA Letter to CRAs at 1–2).) And "[e]ven if a

15  patient eventually pays the full amount . . . , the reporting-timing conspiracy caused,

16  and continues to cause, a delay in that payment[,]" a sort of financial harm. (*Id.* ¶ 56.)

17  **II.    Procedural Background**

18    Adams filed his original Complaint alone, but Defendants brought the first

19  motion to dismiss, which prompted Adams to file the Amended Complaint, where he

20  added Cape as a party. (*See* ECF No. 40.) Defendants then filed a second motion to

21  dismiss, based on the same grounds raised in the first. (*See* MTD (ECF No. 48).)

22  Plaintiffs provided their Opposition, and Defendants replied. (*See* Opp'n (ECF No.

23  51); Reply (ECF No. 52).) The Court heard oral arguments on the Motion on February

24  29, 2024. After, the parties provided supplemental authorities. (*See* ECF Nos. 57–58.)

25  The matter is now fully briefed.

26  ////

27  ////

28  ////

**DISCUSSION**

**III.   Plaintiffs Have Article III Standing**

 **A.   The Court Construes the Motion as Raising a Facial Attack**

  Although Defendants brought the Motion under Federal Rule of Civil Procedure 12(b)(6), Defendants raise arguments going to Plaintiffs' Article III standing. (*See* MTD at 15–16; Reply at 8-9.)  Therefore, the Court reviews this portion of the Motion under Rule 12(b)(1), which is reserved for jurisdictional attacks.  *See In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 319 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 587 U.S. 273 (2019).

  A Rule 12(b)(1) jurisdictional attack may be facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("*SAFE*") (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).  In a facial attack, the challenger takes the allegations as true but challenges whether those allegations are sufficient.  *See id.* at 1039.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.  *Id.*

  Defendants argue that Plaintiffs "do not allege concrete, actual, or imminent injury[,]" (MTD at 15,) and that Plaintiffs "do not plead facts that the CRAs' practices have caused *any* of Plaintiffs' patients to not pay a bill[,]" (Reply at 9 (emphasis in original).)  Thus, the Court concludes that Defendants bring a facial attack because they challenge the sufficiency of Plaintiffs' allegations.  *See SAFE*, 373 F.3d at 1039.

 **B.   Plaintiffs Plead Concrete Harms as a Result of the CRA's Agreement**

  The "irreducible constitutional minimum of standing" contains three elements: (1) injury-in-fact; (2) causation; and (3) redressability.  *Newdow v. Lefevre*, 598 F.3d 638, 642 (9th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  First, the plaintiff must have suffered an "injury-in-fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]'" *Lujan*, 504 U.S. at 560 (citations omitted).  Second, there must be a causal connection between the injury and the

1    conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged

2    action of the defendant, and not . . . th[e] result [of] the independent action of some

3    third party not before the court." *Id.* at 560–61 (citation omitted).  Third, it must be

4    "likely," as opposed to merely "speculative," that the injury will be "redressed by a

5    favorable decision." *Id.* at 561 (citation omitted).  Because Plaintiffs seek injunctive,

6    that is, prospective, relief (*see* AC at 26–27), Plaintiff must also show more than a past

7    exposure to illegal conduct, and must show that they suffer from the "continuing,

8    present adverse effects[,]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)

9    (citation omitted), or that future harm is "certainly impending" or that there is a

10    "substantial risk" that such harm will occur, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398,

11    414 and n.5 (2013) (citation omitted).  Where, as here, a case is at the pleading stage,

12    the plaintiff must "clearly . . . allege facts demonstrating" each element.  *Spokeo, Inc. v.*

13    *Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).

14       Plaintiffs allege a personal pocketbook injury in the form of lost money because

15    they "have a costlier path to collect payments on unpaid medical bills . . . ."  (AC ¶ 52.)

16    A personal pocketbook injury has always been enough for Article III standing

17    purposes, even if just a few pennies or a "trifle."  *United States v. Students Challenging*

18    *Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (quoting Kenneth C.

19    Davis, *Standing: Taxpayers and Others*, 35 U. Chi. L. Rev. 601, 613 (1968)); *see, e.g.*,

20    *Van v. LLR, Inc.*, 61 F.4th 1053, 1064 (9th Cir. 2023) ("Any monetary loss, even one as

21    small as a fraction of a cent, is sufficient to support standing.").

22       Defendants, however, challenge Plaintiffs' allegations "that CRA reporting

23    changes *might* lead some patients to choose not to pay their bills . . . ."  (Reply at 8

24    (citing AC ¶¶ 46–47).)  Defendants argue that Plaintiffs' allegations are too attenuated

25    and do not trace the harm back to Defendants because of the independent actions of

26    third parties.  Both arguments fail at this stage for Article III standing purposes.

27       First, Plaintiffs' theory of harm is not too attenuated because it depends, in part,

28    on at least some patients now not paying their outstanding medical bills or not paying

1  them as timely as before.  (*See* Mot. at 15–16; Reply at 8–9.)  To survive a motion to

2  dismiss for lack of constitutional standing, plaintiffs must establish a "line of causation"

3  between defendants' action and their alleged harm that is more than "attenuated."

4  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting *Allen v. Wright*,

5  468 U.S. 737, 757 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static*

6  *Control Components, Inc.*, 572 U.S. 118 (2014)).  A causation chain does not fail simply

7  because it has several "links," provided those links are "not hypothetical or tenuous"

8  and remain "plausib[le]."  *Id.* (quoting *Nat'l Audobon Soc'y, Inc. v. Davis*, 307 F.3d 835,

9  849 (9th Cir.), *opinion amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002)).

10  "What matters is not the 'length of the chain of causation,' but rather the 'plausibility of

11  the links that comprise the chain.'"  *Id.* (quoting *Autolog Corp. v. Regan*, 731 F.2d 25,

12  31 (D.C. Cir. 1984)).  "In cases where a chain of causation "involves numerous third

13  parties" whose "independent decisions" collectively have a "significant effect" on

14  plaintiffs' injuries, the Supreme Court and [Ninth Circuit] have found the causal chain

15  too weak to support standing at the pleading stage."  *Id*. (citations omitted).

16      Here, there are only three total steps in the causal chain: (1) debt collectors

17  must decide to report patients' medical debt to the CRAs; (2) patients have

18  knowledge of that reporting and threat of a bad credit score; and (3) on the basis of

19  that knowledge, patients decide to pay their bills when they otherwise would not.

20  (*See* Reply at 9 (citing AC ¶¶ 29, 31, 50).)  The Ninth Circuit has found cases including

21  even five steps in the causal chain to not be too speculative for Article III standing.

22  *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 452–53 (9th Cir. 2021).

23      Second, regarding traceability, it is not the length of the chain that matters but

24  the strength of those connections within the chain that does, and Plaintiffs' theory

25  does not fail because it depends on the independent decisions of third parties,

26  namely, the debt collectors and the patients.  *See Autolog Corp.*, 731 F.2d at 31.  This

27  is not a case where standing "depends on the unfettered choices made by

28  independent actors not before the courts and whose exercise of broad and legitimate

discretion the courts cannot presume either to control or to predict[.]" *Lujan*, 504 U.S. at 562 (citation omitted).  Rather, Plaintiffs allege that the debt collectors and patients will respond in predictable ways based on Defendants' incentives or instructions.

First, Plaintiffs allege that Defendants created incentives or instructions for the debt collectors.  Plaintiffs allege that debt collectors used to report medical debt to the CRAs but argue that doing so now for bills under $500 is "pointless" because of the Agreement.  (*See* AC ¶¶ 28–29, 33.)  "And the [CRAs] have instructed accounts-receivable services not to report unpaid medical bills of $500 or more until they are delinquent for 365 days." (*Id.* ¶ 33)  Thus, for the first step, Plaintiffs plead more than speculation; instead, Plaintiffs allege that debt collectors are responding to Defendants' incentives by not reporting medical debt under $500, and to Defendants' instructions by not reporting medical debt that is not unpaid for at least 365 days.

For the next step, Plaintiffs again allege that patients are responding to incentives Defendants created.  Plaintiffs allege that patients have indicated that they will not pay medical bills under $500.  (*See* AC ¶ 47.)  While speculative, this allegation does not "require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.  Rather, Plaintiffs plausibly allege that patients will respond to economic incentives.  As Equifax's website explains in the similar context of loans, reporting an unpaid loan on a credit report "often drives [consumers] to pay those loans on time vs. delaying or not paying those loans that are not reported . . . ." (AC ¶ 45 (citation omitted).)  "Patients underst[and] that an unpaid bill listed on their credit report harm[s] their credit score, which in turn reduce[s] their access to credit, increase[s] their costs to obtain that credit, and decrease[s] options for other financial transactions such as leasing a car." (*Id.* ¶ 31.)  Even Equifax concedes this, recognizing that "consumers today understand that their payment behavior on loans reported to the CRA[ ]s matters." (*Id.* ¶ 32 (citation omitted).)

Thus, Plaintiffs "have met their burden of showing that third parties will likely react in predictable ways . . . , even if they do so unlawfully . . . ." *Dep't of Com. v. New*

1   *York*, 588 U.S. 752, 768 (2019).  For Article III purposes, an antitrust plaintiff establishes

2   injury-in-fact when he "has suffered an injury which bears a causal connection to the

3   alleged antitrust violation."  *Gerlinger v. Amazon.com Inc., Borders Grp., Inc.*, 526 F.3d

4   1253, 1255 (9th Cir. 2008) (quoting *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir.

5   1996), *as amended* (Jan. 15, 1997)).  Accordingly, the Court declines to dismiss this

6   action for lack of Article III standing.

7   **IV.   Plaintiffs' Federal Claim Fails for Lack of Antitrust Standing.**

8       **A.   Legal Standard**

9         While "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional

10   standing requirement of injury in fact, [ ] the court must make a further determination

11   whether the plaintiff is a proper party to bring a private antitrust action."  *Associated*

12   *Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535

13   n.31 (1983) ("*AGC*").  This determination of antitrust standing requires an evaluation of

14   the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship

15   between them.  *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448–49 (9th Cir. 1985)

16   (citations omitted).  Thus, antitrust standing is a more rigorous matter than standing

17   under Article III.  *See Amarel*, 102 F.3d at 1507.

18         A party may move to dismiss for "failure to state a claim upon which relief can

19   be granted[.]"  Fed. R. Civ. P. 12(b)(6).  The motion may be granted if the claim lacks a

20   "cognizable legal theory" or if its factual allegations do not support a cognizable legal

21   theory.  *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019)

22   (citation omitted).  The court assumes all factual allegations are true and construes

23   "them in the light most favorable to the nonmoving party."  *Steinle v. City & Cnty. of*

24   *San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (citation omitted).  If the allegations

25   do not "plausibly give rise to an entitlement to relief[,]" the motion must be granted.

26   *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("*Iqbal*").

27         A complaint need contain only a "short and plain statement of the claim

28   showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed

1  factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*").

2  But this rule demands more than unadorned accusations; "sufficient factual matter"

3  must make the claim at least plausible.  *Iqbal*, 556 U.S. at 678.  In the same vein,

4  conclusory or formulaic recitations of elements do not alone suffice.  *See id*.  This

5  evaluation of plausibility is a context-specific task drawing on "judicial experience and

6  common sense."  *Id*. at 679.

7       **B.**     **Plaintiffs Lack Federal Antitrust Standing.**

8       Plaintiffs' suit stems from alleged violations of Sherman Act Section 1 (15 U.S.C.

9  Section 1), and Plaintiffs seek damages and injunctive relief under Clayton Act

10  Sections 4 and 16 (15 U.S.C. Sections 15, 26), respectively.[1]  (AC ¶ 1.)  Additionally,

11  there is a claim arising under the Cartwright Act, California Business and Professions

12  Code Section 16750.  (*Id*.)  Although there are differences in the scope of these two

13  Acts, the Court will address the Plaintiffs' federal claim, as that is the sole basis for this

14  Court's jurisdiction.

15       The Supreme Court developed the doctrine of antitrust standing to limit the

16  otherwise sweeping language of recovery afforded under Section 4 of the Clayton

17  Act.[2]  *See Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir.

18  1999).  The doctrine looks to the nature of the plaintiff's injury and its connection to

19  the anticompetitive effects of the violation.  *See id*.  The goal of antitrust standing

20  analysis is to determine whether the plaintiff is the proper party to redress the

21  violation.  *Id*.  The Supreme Court identified several factors to consider in deciding

22  whether a plaintiff "who has borne an injury has antitrust standing."  *Id*. at 1054.  These

23   

---

24  [1] Under Section 16 of the Clayton Act, injunctive relief for violations of antitrust laws can be obtained by,

25  "a private plaintiff" who "must generally meet all the requirements that apply to the damages plaintiff, except that the injury itself need only be threatened, damage need not be quantified, and occasionally a party too remote for damages might be granted an injunction.  *Lucas Auto. Eng'g, Inc., v.*

26  *Bridgestone/Firestone, Inc.,* 140 F.3d 1228, 1234 (9th Cir. 1998) (citing 15 U.S.C. § 26).

27   

28  [2] Section 4 of the Clayton Act grants the award of damages to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws. . . ."  15 U.S.C. § 15(a)(1999).

1    factors include: (1) the nature of the plaintiff's injury; that is, whether it was the type the

2    antitrust laws were intended to forestall; (2) the directness of the injury; (3) the

3    speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the

4    complexity in apportioning damages. *Amarel*, 102 F.3d at 1507 (citing *AGC*, 459 U.S

5    at 535).  To determine that antitrust standing exists, a court need not find in favor of

6    the plaintiff on each factor. *Am. Ad. Mgmt*, 190 F.3d at 1055.  Instead, the court

7    should balance the factors, but antitrust injury, "is necessary. . . to establish standing."

8    *Cargill, Inc. v. Monfort of Colo. Inc.,* 479 U.S. 104, 110 n.5 (1986).

9         Defendants argue that Plaintiffs have failed to allege antitrust standing because

10   their injuries are too remote, too speculative, and do not occur in the relevant market.

11   (MTD at 2).  Plaintiffs argue that they have met the antitrust standing requirements

12   based on their alleged injuries flowing from the Defendants' unlawful conduct under

13   Section 1 of the Sherman Act. (*See* Opp'n at 16–17.)  For the reasons discussed

14   below, the Court finds that Plaintiffs have failed to show antitrust standing.

15   Specifically, the Court finds that the Plaintiffs failed to state an antitrust injury, which is

16   a necessary aspect of antitrust standing. *See City of Oakland,* 20 F.4th at 456.

17                              **1.    Antitrust Injury**

18        Antitrust laws seek to preserve competition for the benefit of consumers. *See*

19   *AGC,* 459 U.S. at 538.  Therefore, plaintiffs may only pursue an antitrust action if they

20   can show an "antitrust injury, which is to say the type that antitrust laws were intended

21   to prevent and that flows from that which makes defendants' acts unlawful." *Am. Ad.*

22   *Mgmt.,* 190 F.3d at 1055 (citation omitted).  To assess whether antitrust injury exists,

23   courts are to identify four elements: (1) unlawful conduct (2) causing an injury to the

24   plaintiff (3) that flows from that which makes the conduct unlawful and (4) that is of the

25   type the antitrust laws were intended to prevent. *City of Oakland*, 20 F.4th at 456

26   (quoting *Am. Ad. Mgmt*., 190 F.3d at 1055).  The Supreme Court has "emphasized the

27   central interest [of the Sherman Act] in protecting the economic freedom of

28   participants in the relevant market." *Am. Ad. Mgmt.,* 190 F.3d at 1057 (citation

1  omitted).  From this principle, the Ninth Circuit requires that the "party be a participant

2  in the same market as the alleged malefactors."  *Bhan v. NME Hosps., Inc.*, 772 F.2d

3  1467, 1470 (9th Cir. 1985).

### i.      Defendants' Unlawful Conduct

5          To show an antitrust injury, a plaintiff must first identify the defendant's

6  "unlawful conduct" that would violate antitrust laws.  *Am. Ad. Mgmt.,* 190 F.3d at 1055.

7  Here, Plaintiffs allege that Defendants violated Section 1 of the Sherman Act.  This

8  section prohibits "[e]very contract, combination in the form of trust or otherwise, or

9  conspiracy, in restraint of trade or commerce among the several states or with foreign

10  nations."  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust*

11  *Litig.*, 28 F.4th 42, 46 (9th Cir. 2022) ("*In re DRAM*") (quoting 15 U.S.C. § 1).  The

12  Supreme Court has interpreted this text "to outlaw only unreasonable restraints."  *Aya*

13  *Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021)

14  (citation omitted).

15          Here, Plaintiffs have plausibly alleged facts that would indicate an

16  "unreasonable restraint" by the Defendants.  Specifically, Plaintiffs argue that

17  Defendants, operating jointly, publicly agreed to no longer report medical debt under

18  $500, and to not report any amount of outstanding medical debt for 365 days.

19  (AC ¶¶ 4–5.) Plaintiffs also argue that the three named Defendants are the only

20  significant players in the credit reporting industry.  (*Id.* ¶ 41.)  Prior to the

21  announcement, the Defendants offered the service of reporting all medical debt,

22  regardless of value, after 180 days.  (*See id.* ¶ 38.)  These allegations suggest a

23  horizontal agreement amongst the Defendants to restrict the output of their services.

24  *See NCAA v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 107–08 (1984) ("Restrictions

25  on price and output are the paradigmatic examples of trade that the Sherman Act was

26  intended to prohibit.").  Therefore, the Court finds that Plaintiffs have plausibly alleged

27  unlawful conduct, prohibited by antitrust laws, by the Defendants.

28  ////

### ii.      Injury to Plaintiffs

To show an antitrust injury, a plaintiff must also allege some credible harm caused by the defendant's unlawful conduct.  *Am. Ad. Mgmt.,* 190 F.3d at 1056. Essentially, this means the plaintiff must show that it "stands to suffer, not gain" from the defendant's illegal conduct.  *City of Oakland,* 20 F.4th at 457 (citation omitted). Here, Plaintiffs allege that they suffer from a devalued service because of the anticompetitive effects of the Agreement.  *See NCAA,* 468 U.S. at 107 (describing effects of a horizontal agreement as increased prices, reduced output and both being "unresponsive to consumer preference").  Specifically, Plaintiffs cite to a decreased incentive amongst patients to pay their medical bills because the threat of having the unpaid amount on their credit reports no longer exists.  (AC ¶ 31.)  Furthermore, there is no argument from either party that suggests Plaintiffs stand to benefit from the Defendants' allegedly unlawful behavior.  *See e.g., Big Bear Lodging Ass'n v. Snow Summit Inc.,* 182 F.3d 1096, 1102 (9th Cir. 1999) (finding no antitrust injury where "[p]laintiffs stand to benefit from the fact that the prices for those services are inflated" because of alleged illegal price-fixing.)  Therefore, the Court finds that Plaintiffs have adequately alleged that they have suffered from an injury caused by Defendants' unlawful conduct.

### iii.      Injury Flows From that which Makes the Conduct Unlawful

It is not enough that Plaintiffs' alleged injury flows from the Defendants' unlawful conduct.  Rather, "an antitrust injury must 'flow [] from that which makes defendants' acts unlawful.'"  *Am. Ad Mgmt.*, 190 F.3d at 1056 (citation omitted).  A private plaintiff seeking to show antitrust injury "must identify the economic rationale for a business practice's illegality under the antitrust laws and show that its harm flows from whatever it is that makes the practice unlawful."  Philip E. Areeda & Herbert Hovencamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 391 (5th ed. 2024) ("Areeda and Hovenkamp, *Antitrust Law*").  Even where a clear

1   antitrust violation exists, a party bringing suit still must illustrate that the harm it

2   experiences is a result of that which makes the Defendant's conduct illegal, to have

3   antitrust standing. *See id.* ¶ 337c.

4        Here, Plaintiffs fail to plausibly connect their alleged injury, the devalued

5   service, to that which makes the Defendants' conduct unlawful, the joint decision to

6   stop reporting all forms of medical debt.  The nature of the transaction between

7   Plaintiffs and Defendants is important to understanding why the claim fails.

8   According to the Amended Complaint, following a treatment, Plaintiffs' practices send

9   a bill to a patient for what they owe following insurance coverage.  (AC ¶ 25.)  If the

10   patients fail to pay their bill, Plaintiffs use "third-party accounts-receivable services" as

11   their agents to attempt to collect the unpaid bills.  (*Id.* ¶ 28.)  These third parties have

12   several options at their disposal to incentivize patients to pay, including reporting the

13   unpaid medical bills to credit reporting agencies.  (*Id.* ¶ 29.)  "[O]n information and

14   belief" these third-party agencies have, in fact, shared the Plaintiffs' information with

15   the Defendants.  (*Id.*)

16        The Ninth Circuit's decision in *City of Oakland v. Oakland Raiders* provides a

17   helpful comparison.  There, plaintiff City of Oakland brought suit against the

18   defendants, the National Football League and its thirty-two franchises, including the

19   Oakland Raiders.  20 F.4th at 448.  Plaintiff argued that defendants operated as a

20   cartel by restricting the number of NFL teams and by demanding "supracompetitive

21   prices from host cities."  *Id.* at 456.  The Ninth Circuit held that the plaintiffs adequately

22   alleged that its injury flowed from the defendants unlawfully limiting output below

23   levels dictated by consumer demand.  *Id.* at 457.  The Ninth Circuit found this aspect

24   of antitrust injury was met because the plaintiff alleged that its injuries stemmed from

25   the loss of the Raiders football team, and that the Raiders left Oakland because of

26   Defendants' allegedly unlawful restriction on output.  *Id.*  Moreover, plaintiff credibly

27   alleged that in a competitive market with more teams, the Raiders would not have had

28   the leverage to demand supracompetitive concessions from the City.  *Id.*

1    Here, however, Plaintiffs have not shown that their injury flows from the

2    unlawfulness of Defendant's horizontal agreement.  Nowhere in the pleadings do

3    Plaintiffs claim that they directly provide information to the Defendants, nor do they

4    claim to have any control over whether the third-party agencies actually share the

5    information with the Defendants.  Rather, the Plaintiffs "intend, and prefer" that these

6    third parties "report their patients' unpaid bills to the Three Credit Reporting

7    Agencies."  (AC ¶ 33.)  Because it is ultimately an independent party determining

8    whether the information makes it to the credit reporting agencies, it is unclear

9    whether the "devalued service" injuries suffered by Plaintiffs are the result of "that

10   which makes the defendants' conduct unlawful" – the alleged horizontal agreement –

11   or from the third party's decision to use one of the other mechanisms it has at its

12   disposal to incentivize patients to pay.[3]  *See Brunswick Corp. v. Pueblo Bowl-O-Mat,*

13   *Inc.,* 429 U.S. 477, 488 (1977)*; Sabol v. PayPal Holdings, Inc.,* No. 23-cv-05100-JSW,

14   2024 WL 3924686, at *3 (N.D. Cal.  Aug. 23, 2024) (holding that plaintiffs' injuries did

15   not flow from that which made defendant's conduct illegal where the theory of harm

16   depended on the independent actions of others); *GSI Tech. v. United Memories, Inc.,*

17   No. 5:13-cv-01081-PSG, 2014 WL 1572358, at *4 (N.D. Cal. Apr. 18, 2014) (finding

18   that where a plaintiff's antitrust injury could have occurred even absent the alleged

19   anti-competitive conduct, the plaintiff's injury did not "flow from" the defendant's

20   conduct).

21   Moreover, the Complaint indicates that although Plaintiffs may have

22   experienced an injury, the injury that clearly "flows from that which makes defendant's

23   conduct illegal" is suffered by those who directly purchase the Defendant's credit

24   reports.  Plaintiffs have not plausibly alleged a relationship with the Defendants, and

25   have made no allegations that they purchase, or even use, the credit reports in

26   _____

27   [3] Plaintiffs' failure to provide medical debt information to the CRAs is fatal to their claim under *Illinois Brick* and its progeny as well because "indirect [suppliers] who are two or more steps removed from the

28   antitrust violator in a distribution chain may not sue."  *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019).

assessing whether to accept patients.  Instead, Plaintiffs claim that they suffer from a "devalued service" where losing the threat of having outstanding debt on credit reports hinders re-payment.  (AC ¶ 45.)  Thus, even though the Plaintiffs are asserting that there is a horizontal agreement between Defendants, because Plaintiffs do not appear to be involved in the alleged transaction, the Court cannot find that the injury flows from the illegality of the conduct.  *Cf. Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs.").

### iv.    Participant and Injury in the Same Market

Lastly, a plaintiff's injury must also be "of the type the antitrust laws were intended to prevent."  *Am. Ad. Mgmt.*, 190 F.3d at 1057.  The primary purpose of antitrust laws is to preserve competition.  *See Knevelbaard Dairies,* 232 F.3d at 988.  "The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors."  *Bhan,* 772 F.2d at 1470.  Furthermore, the plaintiff must have suffered its injury in the market where competition is being restrained.  *Am. Ad. Mgmt,* 190 F.3d at 1057.  Defendants argue that none of the Plaintiffs' injuries occur in the relevant market they allege.  Plaintiffs argue that they have sufficiently shown that they are participants in the relevant market and that even if they did not, their injuries are "inextricably intertwined" such that they should be afforded antitrust standing.

The Ninth Circuit has held that it is not the "status" of a plaintiff that automatically confers antitrust standing "but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff."  *Am. Ad. Mgmt.*, 190 F.3d at 1058.  Thus, while consumers and competitors tend to be the most likely to suffer an antitrust injury, the claims of other market participants are recognized as well.  *Id*. at 1057.  Suppliers may have standing where they "can prove [they] suffered lower selling prices or diminished volume or other profit reduction as a result of illegal

1    conduct by the defendant(s)." *Amarel*, 102 F.3d at 1510 (quoting Areeda and

2    Hovenkamp, *Antitrust Law* ¶ 350a).  Plaintiff suppliers typically have sufficiently direct

3    injuries where they "both compete[] with defendants and [are] their target." *Amarel*,

4    102 F.3d at 1510 (quoting Areeda and Hovenkamp, *Antitrust Law* ¶ 350d).

5            Here, Plaintiffs argue that they participate in, and suffer their injuries in, the

6    market for providing and receiving medical-debt information for the purpose of

7    reporting it on consumer credit reports.  (AC ¶ 60.)  Plaintiffs are not customers of

8    Defendants, as Plaintiffs make no purchases from the Defendants and they are not

9    competitors, as there are no allegations that the medical providers "have actual or

10   potential ability to deprive" the credit reporting agencies "of significant levels of

11   business."  Furthermore, Plaintiffs have not asserted a plausible theory about being

12   the target of the Defendant's actions. *Cf. Amarel,* 102 F.3d at 1510 (finding that

13   plaintiffs successfully alleged that a conspiracy to restrain trade had a central aim to

14   eliminate independent rice farmers).  Rather, Plaintiffs claim that they "conduct a

15   transaction" in the relevant market by providing information about medical debt to the

16   Defendants in exchange for their service that encourages patients to pay their medical

17   bills.  (AC ¶¶ 60, 62.)

18           However, the Court finds that these allegations do not indicate that Plaintiffs are

19   participants of, or suffered injury in, the relevant market.  In *Amarel v. Connell*, the

20   Ninth Circuit found that plaintiff rice farmers, who were also suppliers, had standing to

21   bring suit because they were also competing in the same market as the defendant

22   where they had independent contracts with other rice mills that provided them a

23   share of profits from the sale of milled rice.  102 F.3d at 1510.  Here, however, there is

24   no contract between Plaintiffs and Defendants to provide medical debt information.

25   Rather, Plaintiffs point to Defendants' website description as evidence that Plaintiffs

26   are necessary participants in the relevant market.  (AC ¶ 32.)  The Court does not

27   doubt that Plaintiffs may provide useful information to the Defendants.  However,

28   Plaintiffs' unilateral decision to share medical-debt information with a third-party

service that ultimately decides whether that information makes it to the Defendants does not constitute a "transaction" such that they would be considered participants in the medical-debt information market.  Rather, Plaintiffs' primary services are in the medical services market.  Thus, when considering the "relationship between the defendant's unlawful conduct and the resulting harm to plaintiff" the Court cannot conclude from the present allegations that Plaintiff participates in, and experiences injury in, the relevant market.  *See Cargill Inc. v. Budine,* No.1:07-cv-00349-LJO-SMS, 2007 WL 2506451, at *5 (E.D. Cal. Aug. 7, 2007) (citation omitted).

A plaintiff who does not directly participate, or suffer injury in, the relevant market may still have antitrust standing where "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on [the relevant] market. *Blue Shield of Va. v. McCready,* 457 U.S. 465, 483–84 (1982).  To meet this exception, the plaintiff must be "the 'direct victim' of a conspiracy or the 'necessary means' by which the conspiracy was carried out." *Lorenzo v. Qualcomm Inc.,* 603 F. Supp. 2d 1291, 1300–01 (S.D. Cal. 2009).  Here, Plaintiffs argue that (1) they are the target of the Defendants' actions because the Defendants could not have removed medical debt information from their credit reports without harming medical providers and (2) that the harm was intention because the Defendants did not agree to remove any other type of information.  (Opp'n at 21–22.)

However, this exception does not apply to Plaintiffs because Plaintiffs do not *directly interact* with Defendants and were thus not necessary to the Agreement.  *See McCready*, 457 U.S. at 479.  Ultimately, Plaintiffs fail to explain how "the actions taken against [them] affected the [restrained] market." *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 745 (9th Cir. 1984).  *McCready* applies "to those whose injuries are the essential means by which defendants' illegal conduct brings about its ultimate injury to the [restrained] marketplace."  Areeda and Hovenkamp, *Antitrust Law* ¶ 339f.  *Accord In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158–61 (2d Cir. 2016) (collecting cases).  That is not the case here.

1    Without showing that they are participants in the relevant market, or that their

2    injuries are "inexplicably intertwined" under *McCready*, Plaintiffs fail to meet the

3    requirements for antitrust injury.

4    Lastly, the Court finds that, although not alone dispositive, the pleadings

5    indicate that there are more direct victims of Defendants' allegedly anticompetitive

6    behavior.  Particularly, those who purchase the credit reports from Defendants and

7    those who directly contract with the Defendants to provide medical-debt information.

8    *See AGC*, 459 U.S. at 542; *Budine,* 2007 WL 2506451, at *7 (finding that the existence

9    of more direct parties weighed against finding antitrust standing);  *In re American*

10   *Express Anti-Steering Rules Antitrust Litigation,* 431 F. Supp. 3d 395, 411 (E.D. N.Y.

11   2020) (stating that denying standing to plaintiffs was not likely to leave a significant

12   antitrust violation unremedied where there was an "obvious class" of more direct

13   victims).

14                    **2.    Remaining Factors**

15   In light of the failure to allege an antitrust injury and the likelihood that there are

16   more direct victims of the alleged antitrust violation, the Court need not address the

17   remaining factors as the existence of an antitrust injury is dispositive.  *See City of*

18   *Oakland,* 20 F. 4th at 456 ("The first factor – antitrust injury – is mandatory"); *Am. Ad.*

19   *Mgmt.,* 190 F.3d at 1055 ("[T]he Supreme Court has noted that '[a] showing of antitrust

20   injury is necessary, but not always sufficient, to establish standing under § 4.'").

21   **V.    Plaintiffs Are Granted Leave to Amend**

22   Requests for leave to amend should be granted with "extreme liberality."

23   *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citation omitted).

24   When considering whether to grant leave to amend, a district court should consider

25   several factors including undue delay, the movant's bad faith or dilatory motive,

26   repeated failure to cure deficiencies by amendments previously allowed, undue

27   prejudice to the opposing party, and futility.  *Id.* (citing *Foman v. Davis*, 371 U.S. 178,

28   182 (1962)).  Of the *Foman* factors, prejudice to the opposing party carries the most

weight.  *Id.* (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).  Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend. *Eminence Capital, LLC*, 316 F.3d at 1052 (citation omitted).

Although the Court is cognizant that this is the First Amended Complaint, this case is still at an early stage in the litigation and the Plaintiffs have not had the benefit of the Court's ruling.  Therefore, the Court GRANTS Plaintiffs leave to amend.

## VI.    The Court Declines to Exercise Supplemental Jurisdiction

A district court that has original jurisdiction over a civil action "shall have supplemental jurisdiction," subject to certain exceptions, "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  *See Arroyo v. Rosas*, 19 F.4th 1202, 1209 (9th Cir. 2021) (quoting 28 U.S.C. § 1367(a)). However, when a district court "has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over remaining state law claims.  28 U.S.C. § 1367(c)(3).  The Court declines to exercise supplemental jurisdiction here, subject to an amended complaint that states a valid federal claim. The Court thus DISMISSES without prejudice Plaintiffs' Cartwright Act claim.

## CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 48).Because the Court DISMISSES Plaintiff's federal claim under the Sherman Act in Count One, the Court DECLINES to exercise supplemental jurisdiction over Plaintiffs' Cartwright Act claim in Count Two, which the Court also DISMISSES.  However, Plaintiffs are GRANTED leave to amend.  Plaintiffs have 30 days from the docketing of this Order to file and serve their Second Amended Class Action Complaint, and ////

1  Defendants have 14 days from the filing of the Second Amended Class Action

2  Complaint to file their next responsive pleading.

3

4       IT IS SO ORDERED.

5  Dated:   **December 31, 2024**

6  Hon. Daniel J. Calabretta
    UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28