1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  DERRICK ADAMS, et al.,                    No. 2:23-cv-01773-DJC-JDP

12              Plaintiffs,

13        v.                                  <u>ORDER</u>

14  EXPERIAN INFORMATION SOLUTIONS,
15  INC., et al.,

16              Defendants.

17

18        Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Second

19  Amended Complaint.  Plaintiffs allege that Defendants violated the Sherman Antitrust

20  Act, the California Cartwright Act, and engaged in tortious interference with existing

21  contracts under California and New Jersey law.  Defendants move to dismiss on the

22  grounds that Plaintiffs failed to allege antitrust standing and failed to plausibly allege

23  facts supporting their tortious interference with contracts claims.  For the reasons

24  discussed below, the Court GRANTS IN PART AND DENIES IN PART Defendants'

25  Motion to Dismiss.

26                              **BACKGROUND**

27        The facts and procedural history are largely known to the Parties.  However,

28  Plaintiffs have altered the Second Amended Complaint in a few ways.  First, Plaintiffs

                                      1

add AmeriFinancial Solutions, as a plaintiff to this case.[1]  AmeriFinancial Solutions is a collection agency that works with multiple medical practices to assist them in collecting payment of unpaid medical bills from patients.  (SAC (ECF No. 60) ¶ 27.) Specifically, AmeriFinancial Solutions has served as the collection agency for Plaintiff Cape Emergency Physicians in New Jersey and for other medical practices operating out of several different states – including California. (*Id.*)  The collection agencies make a profit when patients pay a bill that the medical provider sent to the collection agency. (*Id.* ¶ 44.)  Specifically, the SAC alleges that the collection agency receives a percentage of the medical debt it is able to collect. (*Id.*)

Second, Plaintiffs add claims for tortious interference with contract under California and New Jersey law.  These claims are brought by each Medical Provider Plaintiff ("MPP").  Plaintiff Adams brings the claim under California law and Plaintiff Cape Emergency Physicians brings the claim under New Jersey law.

Third, Plaintiffs include additional allegations about the nature of the relationship between the MPPs and the collection agencies.  In particular, MPPs explain that if patients do not pay their bills, medical practices use accounts-receivable services as their "agents" to further attempt to collect payment from unpaid patients. (*See id.* ¶¶ 30, 38.)  The accounts-receivable services could be employees of the medical practice itself, or it could be a collection agency such as AmeriFinancial Solutions. (*Id.* ¶ 30.)  The MPPs here use third-party collection agencies if patients do not pay their bills. (*Id.* ¶ 31.)  To furnish data to a credit reporting agency, the furnishing entity must complete an application with that agency, execute a contract, and complete an onboarding process. (*Id.* ¶ 38.)  The MPPs decided that a collection agency would furnish data about medical bills to Defendants if the efforts to contact patients failed to obtain payment. (*Id.* ¶ 40.)  Plaintiffs allege there are contracts with collection agencies that authorize the collection agencies to furnish such data. (*Id.*)

---

[1] For purposes of this Order, the Court also refers to AmeriFinancial Solutions as the "Collection Agency Plaintiff".

1    Should the collection agency fail to collect from the patient, and not furnish the data

2    to the Defendants, as instructed by the MPPs, "the [MPPs] would each choose a

3    different collection agency." (*Id.* ¶ 41.)[2]

4          This Court previously granted Defendants' Motion to Dismiss Plaintiffs' First

5    Amended Complaint. (Jan. Order (ECF No. 59).) Plaintiffs then filed a Second

6    Amended Complaint with four causes of action for violations of the Sherman Antitrust

7    Act, California's Cartwright Act, and for alleged tortious interference with existing

8    contracts under California and New Jersey Law. Defendants filed the instant Motion

9    to Dismiss Plaintiffs' Second Amended Complaint (Mot. Dismiss (ECF No. 73)). The

10   matter is fully briefed (Opp'n (ECF No. 77); Reply (ECF No. 79)). The Court ordered

11   the matter submitted without oral argument pursuant to Local Rule 230(g). (ECF No.

12   81).

13                                    **LEGAL STANDARD**

14          A party may move to dismiss for "failure to state a claim upon which relief can

15   be granted[.]" Fed. R. Civ. P. 12(b)(6). The motion may be granted if the claim lacks "a

16   cognizable legal theory" or if its factual allegations do not support a cognizable legal

17   theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019)

18   (citation omitted). The court assumes all factual allegations are true and construes

19   "them in the light most favorable to the nonmoving party." *Steinle v. City & Cnty. of*

20   *San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (citation omitted). If the allegations

21   do not "plausibly give rise to an entitlement to relief[,]" the motion must be granted.

22   *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("*Iqbal*").

23          A complaint need contain only a "short and plain statement of the claim

24   showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), not "detailed

25   factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*").

26
27   [2] Additionally, since the time between this Court's previous dismissal of Plaintiffs' complaint, the CFPB
     published a final rule prohibiting CRAs from including any medical debt on consumer reports provided
     to creditors in most circumstances. However, the rule's effective date has been delayed. (*See* Opp'n at
28   3 citing 791 F. Supp. 3d 720 (E.D. Tex. 2025) (Notice (ECF No. 23).)

1    But this rule demands more than unadorned accusations; "sufficient factual matter"

2    must make the claim at least plausible.  *Iqbal*, 556 U.S. at 678.  In the same vein,

3    conclusory or formulaic recitations of elements do not alone suffice.  *See id.*

**DISCUSSION**

5    **I.    Sherman Act**

6          Defendants contend that Plaintiffs again fail to allege antitrust standing.

7    Specifically, Defendants argue that Plaintiffs' injury is not the type of injury antitrust

8    laws were intended to remedy, does not flow from the alleged conduct, is indirect and

9    is speculative.  Plaintiffs argue that the SAC remedies the Court's prior concerns about

10   antitrust standing because it includes a collection agency plaintiff that personally

11   furnished data to the Defendants under contracts with them and expounds on the

12   relationship between medical providers and Defendants.

13         **A.  Antitrust Standing**

14         Under Section 1 of the Sherman Antitrust Act, all conspiracies in the restraint of

15   trade are illegal.  15 U.S.C. § 1.  Actions for damages under the Sherman Act are

16   authorized by Section 4 of the Clayton Antitrust Act.  15 U.S.C. § 15(a); *City of Oakland*

17   *v. Oakland Raiders,* 20 F. 4th 441, 455 (9th Cir. 2021).  Section 4 provides that "any

18   person who shall be injured in his business or property by reason of anything

19   forbidden in the antitrust laws may sue therefor. . .and shall recover threefold the

20   damages by him sustained[.]"  *Am. Ad. Mgmt., Inc., v. Gen. Tel. Co. of California,* 190

21   F.3d 1051, 1054 (9th Cir. 1999) (citing 15 U.S.C. § 15(a) (1999)).  Although broad in

22   scope, courts have read limitations into the language of Section 4 premised on the

23   idea that "Congress did not intend [it] to have such an expansive scope."  *Id.* (citation

24   omitted).  The Supreme Court has identified certain factors for determining whether

25   antitrust standing exists:  "(1) the nature of the plaintiff's alleged injury; that is, whether

26   it was the type the antitrust laws were intended to forestall; (2) the directness of the

27   injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and

28   (5) the complexity in apportioning damages."  *Oakland Raiders,* 20 F.4th at 455

1  (citation omitted).  A court "need not find in favor of the plaintiff on each factor," *id.* at

2  1055–56, but, antitrust injury is mandatory, *see Cargill v. Monfort of Colorado, Inc.,* 479

3  U.S. 104, 109–10,110 n.5 (1986). [3]

4          **1. Antitrust Injury**

5          An antitrust injury is "of the type the antitrust laws were intended to prevent and

6  that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA*

7  *Petroleum Co.,* 495 U.S. 328, 334 (1990) (citation omitted).  The Ninth Circuit has

8  identified four requirements for an antitrust injury: "(1) unlawful conduct, (2) causing

9  an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and

10 (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad. Mgmt.,* 190

11 F.3d 1055.  In the previous Order, this Court found that the first two requirements of

12 antitrust injury: (1) unlawful conduct (2) causing injury to the plaintiff were satisfied.

13 Thus, the Court focuses on the remaining two requirements.

14         Previously, this Court held that Plaintiffs failed to allege an antitrust injury

15 because "it is unclear whether the 'devalued service' injuries suffered by Plaintiffs are

16 the result of 'that which makes the defendants' conduct unlawful – the alleged

17 horizontal agreement – or from the third party's decisions to use one of the other

18 mechanisms it has at its disposal." (Jan. Order at 16.)  Defendants contend that the

19 addition of AmeriFinancial Solutions, a collection agency, does not change the Court's

20 prior finding that the injury here does not flow from that which makes the conduct

21 unlawful.  Plaintiffs argue that the Collection Agency Plaintiff, and additional

22 allegations about their relationship with the MPPs, removes any concern because the

23 collection agencies do not make an <u>independent </u>decision to furnish the medical-debt

24 information but instead are directed to do so by the MPPs.  Thus, the MPPs' injury

25 would not occur but for the Defendants' alleged conspiracies.

26

27 ─────────────────────
   [3] Apart from challenging antitrust standing, Defendants do not contest in this Motion that Plaintiffs have
28 plausibly alleged the existence of a horizontal conspiracy under Section 1 of the Sherman Act.

1    Considering first the Collection Agency Plaintiff, the Court finds it plausible that

2 the devalued service injury flows from the alleged unlawful conduct.  Unlike the MPPs,

3 the collection agencies appear to have a direct relationship with the Defendants.

4 Specifically, the SAC alleges that the Collection Agency Plaintiff has personally

5 furnished medical-debt information to Defendants, (SAC ¶ 28), and that to provide

6 medical data to a credit reporting agency the furnishing entity executes a contract and

7 takes on an obligation to furnish "full files on a monthly basis" to the credit reporting

8 agency (*id.* ¶ 36).

9    The argument surrounding the MPPs is less straightforward.  In the SAC,

10 Plaintiffs provide additional allegations about the alleged agency relationship

11 between the medical providers and the collection agents.  The Restatement of Agency

12 explains that "[a]gency is the fiduciary relationship that arises when one-person (a

13 'principal') manifests assent to another person (an 'agent') that the agent shall act on

14 the principal's behalf and subject to the principal's control, and the agent manifests

15 assent or otherwise consents so to act."  Restatement (Third) of Agency § 1.01.

16 "Although the precise details of the agency relationship need not be pleaded to

17 survive a motion to dismiss, sufficient facts must be offered to support a reasonable

18 inference that an agency relationship existed." *Kristensen v. Credit Payment Servs.,* 12

19 F. Supp. 3d 1292, 1301 (D. Nev. 2014) (citing *Iqbal,* 556 U.S. at 696).

20    Here, Plaintiffs contend that the MPPs have contracts with collection agencies

21 that authorize the furnishing of medical-debt data about medical bills to the

22 Defendants.  (SAC ¶ 40.)  Plaintiffs further contend that the medical providers are

23 recognized as the owners of the debt (*id.* ¶ 38) and that data furnished to the

24 Defendants includes the medical provider's name as the original creditor of the debt.

25 As such, the MPPs are alleged to "remain[] in control of the decisions whether to send

26 a particular unpaid bill to a collections agent and whether the authorize the collections

27 agent to furnish the data to the [Defendants]." (*Id.* ¶ 39.)  Additionally, Plaintiffs allege

28 that if a collection agency does not furnish the data as directed, the medical provider

1    will "switch collection agencies." (Opp'n at 6 citing SAC ¶¶ 28, 31, 36, 41.) Because

2    the medical providers are essentially the ones dictating whether the collection agency

3    furnishes data, there is "no independent decision" that the collection agencies make

4    as to whether to furnish the data. (*Id.*)

5            The Court finds that the MPPs have failed to allege a plausible agency

6    relationship such that the injury in question would flow from that which makes the

7    alleged conduct illegal. In particular, the Court is skeptical about the level of control

8    the medical providers exercise over the collection agencies. There is no doubt the

9    medical providers authorize the collection agencies to share the medical debt

10   information with the Defendants. (SAC ¶ 39.) However, authorizing the collection

11   agency, and directing the collection agency, are different. While the collection

12   agencies may have an incentive to abide by the medical providers' wishes, the agency

13   still has a number of tools at its disposal and likely still selects the tool that it believes

14   will ensure repayment most effectively. This independence suggests that the

15   collection agency is not an agent of the medical providers. Moreover, the allegation

16   that the medical provider can switch collection agencies if the agency does not do

17   what the medical provider requests is indicative of the agency's independence: if

18   there were a true agency relationship, the medical provider would simply direct them

19   to report delinquent debt to the credit agencies. Without plausibly establishing an

20   agency relationship here, the Court finds that the same issues exist as in the previous

21   Complaint.

22           The Court turns next to the issue of whether each Plaintiff participates in the

23   market that they allege Defendants restrained: the market for reporting medical-debt

24   information. Previously, the Court found that the allegations did not indicate that

25   Plaintiffs "were participants of, or suffered injury in, the relevant market." (Jan. Order

26   at 18.)

27           Here, the Court disagrees with the Defendants' characterization that Collection

28   Agency Plaintiff is "not injured by being unable to supply medical-debt information to

1   the Defendants." (Mot. Dismiss at 13.)  Plaintiffs specifically allege that the contractual

2   relationship between the Defendants and the collection agencies require supplying a

3   certain amount of information.  (SAC ¶¶ 28, 36.)  As such, the Court is satisfied that the

4   Collection Agency Plaintiff participates in the relevant market.  For the reasons

5   discussed above, the Court again rejects the MPPs' arguments that they are in the

6   market because they are the principals in an alleged agency relationship.

7       Additionally, Plaintiffs argue that the circumstances in *Amarel v. Connell,* 102

8   F.3d 1494 (9th Cir. 1996), resemble the instant set of facts.  In *Amarel*, the Ninth Circuit

9   found that an antitrust injury existed where rice farmer plaintiffs alleged participation

10  in a market by virtue of "participation contracts" such that the defendants' predatory

11  pricing harmed them by depressing prices below their costs.  *Id*. at 1059.  But there

12  are a few important differences between the rice farmer plaintiffs in *Amarel* and the

13  MPPs.  First, unlike the MPPs, the Ninth Circuit recognized that the rice farmer plaintiffs

14  were suppliers as well as competitors in the relevant market.  *Id*. at 1510 ("[P]laintiffs

15  and defendants, while not identical entities, are nonetheless competitors in a

16  particular market segment: the market for milled rice.").  Here, there is no comparable

17  allegation – the MPPs could only be considered "suppliers."  Thus, although not

18  dispositive, the rice farmers participation in the market is far more evident than the

19  MPPs here.  Additionally, the payment arrangement in *Amarel* provided the rice

20  farmers with a share of the profits of the sale of the milled rice to the defendant buyer.

21  *Id*. 1510.  Here, the MPPs do purport not receive any renumeration whatsoever from

22  the provision of medical-debt information between the collection agency and the

23  Defendants.  (*See* SAC ¶ 36.)  Rather, any benefit for the MPPs appears to be

24  experienced in the market for debt-collection services, because the payment is such

25  that the collection agencies receive a portion of the profit of the bills ultimately paid

26  by the patients to the medical providers.  Thus, the MPPs are not participants in the

27  relevant market for purposes of establishing an antitrust injury.  Thus, the MPPs fail to

28

1  allege antitrust injury.  The Court proceeds with the inquiry as to the Collection

2  Agency Plaintiff.

3              **2.  Directness of the Injury**

4          Previously, this Court recognized that "although not alone dispositive, the

5  pleadings indicate that there are more direct victims of Defendants' allegedly

6  anticompetitive behavior." (Jan. Order at 20.)  In particular, the Court explained that

7  the most direct victims of the alleged conspiracy here would be consumers who

8  purchase the credit reports.  Defendants argue that Plaintiffs' injuries are too indirect

9  because they involve an attenuated chain of causation that depends on the

10  intervening decision of patients and collection agencies.  Plaintiffs, positioning

11  themselves as suppliers in the relevant market, contend that the patients do not create

12  an issue of indirectness because patients do not sit between the medical providers

13  and the Defendants in sharing the medical-debt information.

14          To establish directness, courts "look[ ] to whether [the plaintiff's] alleged injury

15  was the direct result of [the defendant's] allegedly anticompetitive conduct."  *Am. Ad.*

16  *Mgmt.,* 190 F.3d at 1058.  This factor considers "the chain of causation between [the

17  plaintiff's] injury and the alleged restraint in the market. . . ."  *Id.* (citation omitted).

18  "The harm may not be 'derivative and indirect' or 'secondary, consequential, or

19  remote.'"  *Theme Promotions, Inc., v. News Am. Mktg. FSI,* 546 F.3d 991,1004 (9th Cir.

20  2008) (citations omitted).

21          The Parties dispute the nature of the alleged injury here, and their discussions

22  of directness vary accordingly.  Defendants argue that the injury here turns on patients

23  paying their bills.  (MTD at 8.)  Plaintiffs contend that their injury is a devalued medical-

24  debt reporting service.  (Opp'n at 4–5.)  Under the Defendants' classification of the

25  injury, it appears that the harm is indirect – whether or not medical providers and

26  collection agencies are injured in that instance is based on whether patients pay their

27  bills.  *See, e.g., Pac. Recovery Sols. v. United Behav. Health,* 481 F. Supp. 3d 1011,

28  1022 (N.D. Cal. 2020) ("Plaintiffs allege that their own injury arises only to the extent

9

that their patients do not pay the amounts that defendant does not

reimburse. . .[a]ccordingly, plaintiffs' injuries appear to be derivative of injuries that

their patients allegedly suffered as a result of defendants' alleged conspiracy.").

Under the devaluation of service injury, Plaintiffs allege that Defendants, via an alleged

agreement, stopped reporting certain types of medical-debt information on their

consumer reports.  As a result, Plaintiffs contend that they experience a devalued

service from Defendants, which removed an incentive for patients to repay their bills.

Because the Collection Agency Plaintiff has alleged that the patients are not the

source of the injury, it is plausible that the harm they experience is not indirect.

However, it is still clear that the most direct harm would be to those who purchase

Defendants' credit reports, without the relevant medical-debt information, who would

now be paying for an allegedly lower quality report.  Thus, this consideration weighs

slightly against a finding antitrust standing.

### 3.  Speculative Nature of the Injury

The speculative nature of the injury considers whether the Plaintiff's "damages

are only speculative."  *Am. Ad. Mgmt.,* 190 F.3d at 1059.  In *Associated General*

*Contractors of California v. California State Council of Carpenters,* the Supreme Court

found the damages claim in question to be speculative because (1) the alleged injury

was indirect and (2) the alleged effects . . . may have been produced by independent

factors."  459 U.S. 519, 541 (1983).  Defendants argue that the theory of Plaintiffs'

injury is too speculative because it depends on the actions of independent actors, and

because Plaintiffs have not shown that the market in which they participate is

inextricably intertwined with the asserted market.  Plaintiffs contend that they have

sufficiently alleged non-speculative measure of their harm.

Here, the harm that the Plaintiffs experience does not appear to be speculative.

Plaintiffs contend that due to the devalued service by the Defendants, the incentive for

patients to pay their medical bills has been removed.  As a result, there are increased

costs that the Plaintiffs experience.  Although the exact amount is speculative, the

1    injury itself does not appear to be – it is plausible that there is a devalued service for

2    suppliers of medical debt information where Defendants are alleged to have agreed

3    to stop reporting certain types of information.  *See Don Copeland v. Energizer*

4    *Holdings, Inc.,* 716 F. Supp. 3d 749, 771 (N.D. Cal. 2024) ("That damages may be

5    complex to measure does not mean they are speculative.") (citation omitted).  Thus,

6    this factor counsels in favor of finding antitrust standing.

7           **4.  Remaining Factors**

8           "The risk to be avoided under [the duplicative recovery factor] is that potential

9    plaintiffs may be in a 'position to assert conflicting claims to a common fund. . .thereby

10    creating the danger of multiple liability for the fund.'"  *Am. Ad. Mgmt.,* 190 F.3d at

11    1059 (citation omitted).  Defendants argue that the Plaintiffs' case risks duplicative

12    recovery, Plaintiffs argue that there is no risk of duplicative recovery because each

13    Plaintiff suffers a different sort of damage.  Here, the Collection Agency Plaintiff is

14    alleged to be a "distinct economic entity" with financial interests different from the

15    MPPs' financial interests.  As such, it is not apparent at this stage that there would be

16    issues of duplicative recovery because the Collection Agency Plaintiffs have its own

17    separate, although closely related, financial interests from the MPPs.

18           Lastly, Plaintiffs contend that there will be no complexity in apportioning

19    damages because the collection agencies each suffer their own increased costs to

20    collect payment, and the contracts between medical providers and collection

21    agencies already apportion the percentage of payment that the collection agencies

22    will receive.  Defendants argue that there will be difficulty in apportioning damages

23    due to different reporting practices that collection agencies engage in.  Here, the

24    issue of apportionment between Plaintiffs does not appear to be an issue because

25    there are alleged to be certain percentages that indicate the amount each Plaintiff is

26    entitled to receive.  Thus, neither factor weighs against finding antitrust standing.

27           Accordingly, the Court DENIES Defendants' Motion to Dismiss as it pertains to

28    the Collection Agency Plaintiffs on the Sherman Act cause of action.  However, the

1  medical provider plaintiffs have failed to allege claims under the Sherman Act and the

2  Cartwright Act[4], and the Motion to Dismiss these claims is GRANTED as to these

3  Plaintiffs.

4  **II.    Tortious Interference with Existing Contracts**

5          Defendants also seek to dismiss the MPPs' claims for tortious interference with

6  contract.  Defendants contend that Plaintiffs fail to plead facts that satisfy their

7  purported claims.  The MPPs argue that they have sufficiently alleged their claims.

8          **A.  California**

9          Plaintiff Adams brings a cause of action against Defendants for tortious

10 interference with existing contracts under California law.  Tortious interference with

11 existing contracts under California law requires: "(1) a valid contract between plaintiff

12 and a third party; (2) defendant's knowledge of this contract; (3) defendant's

13 intentional acts designed to induce a breach or disruption of the contractual

14 relationship; (4) actual breach or disruption of the contractual relationship; and (5)

15 resulting damage."  *Honey Bum, LLC v. Fashion Nova, Inc.,* 63 F.4th 813, 824–25 (9th

16 Cir. 2023) (citations omitted).  Generally, it is not necessary that the Defendant's

17 conduct is wrongful apart from the interference with the contract itself.  *Ixchel Pharma,*

18 *LLC v. Biogen, Inc.,* 9 Cal. 5th 1130, 1141, 1148 (2020).  Defendants contend that

19 Plaintiff Adams has failed to plead each of the elements but only presents arguments

20 as to the first three requirements.

21 ////

22 ////

23 ////

24 _____

[4] Plaintiff Adams and the MPP subclass in California also brings a cause of action for violations of

25 California's Cartwright Act.  Generally, the "analysis under the Cartwright Act mirrors the analysis under
   the Sherman Act."  *Flaa v. Hollywood Foreign Press Ass'n,* 55 F.4th 680, 688 (9th Cir. 2022).  Because

26 the MPPs fail to allege antitrust injury, the Court dismisses the second cause of action.  *See Metro-*
   *Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 269 F. Supp. 2d 1213, 1224 (C.D. Cal. 2003) ("It is clear,

27 for instance, that the Cartwright Act's more expansive standing provision does not dispense with the
   requirement that an antitrust plaintiff allege an injury of the type the antitrust laws were intended to

28 prevent and that flows from that which makes defendants' acts unlawful."  (citation omitted).

1

### 1. Valid Contract

2        A claim for tortious interference with contract requires the "existence of a

3    legally binding contract."  *See Ixchel Pharma, LLC,* 9 Cal. 5th at 1141.  The plaintiff

4    must identify the "terms of the contract 'third party or parties with whom they

5    contracted, and the nature and extent of their relationship with that party or parties.'"

6    *Tripharma, LLC v. First Fruits Bus. Ministry, LLC,* No. 8:21-cv-01806-JVS-JDEx, 2023 WL

7    2695476, at *8 (C.D. Cal. Feb. 15, 2023) (internal quotations and citations omitted).

8        The SAC alleges that Plaintiff Adams entered into "valid contracts" with patients

9    that "require patients to pay for the medical services they receive, including the

10   portion beyond what is covered by health insurance or another payor."  Moreover,

11   Plaintiff Adams points to allegations that "Defendants received data showing specific

12   patients had medical bills owed to specific medical providers, including [Plaintiff

13   Adams] in particular," (*id.* citing SAC ¶¶ 31, 38) and "Defendants even relied on this

14   information about contractually obligated debts to calculate the statistic in their press

15   release that their joint measure will remove nearly 70% of medical collection debt

16   tradelines from consumer credit reports," (*id.* citing SAC ¶ 45), to support his claim.

17       The Court finds that these allegations sufficiently allege the existence of a valid

18   contract.  The SAC states the parties to the alleged contracts: Plaintiff Adams and

19   "patients"; the terms of the contract: that patients would pay Plaintiff Adams in

20   exchange for medical services they receive from him – including the portion not

21   covered by health insurance or another payor; and the nature of the contract: a

22   contract for medical services between a doctor and patient.  Defendants do not

23   dispute the existence of a valid contract between Plaintiff Adams and the patient

24   group but instead contend that there is no "specific contract" identified.  However,

25   that is not necessary here because it is clear which group of individuals are being

26   referenced.  Thus, the fact that Plaintiff Adams has not included specific contracts with

27   patients is not fatal to his claim at this stage in the proceedings.

28   ////

## 2. Knowledge of the Contracts

Defendants also contend that Plaintiff Adams has not established that Defendants had knowledge of the contracts with patients.  Plaintiff Adams argues that he need not list the specific contracts Defendants knew about.  The defendant must know of the existence of the contract.  *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.* 50 Cal.3d 1118, 1126 (1990)*;* 5 B.E. Witkin, *Summary of California Law*, Torts § 848 (11th ed. 2023); Restatement (Second) of Torts § 766, cmt. i (1979)("the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract.").

Here, the allegations sufficiently allege knowledge of the contracts between Plaintiff Adams and the third parties.  The SAC states that Defendants "knew that patients had contractual obligations to pay medical providers but had not yet paid" because "Defendants possessed detailed data showing the existence of contracts between medical providers and patients." (SAC ¶ 140.)  Moreover, Defendant's data included identification of specific patients with unpaid bills and "the medical provider's name as the original creditor of the debt." (*Id.* ¶ 38.)  Defendants are alleged to also have relied on this information to calculate the statistic in their press release that their "joint measures will remove nearly 70% of medical collection debt tradelines from consumer credit reports." (*Id.* ¶ 45.)  Taken together, these allegations indicate that Defendants had more than a generalized knowledge of the contracts. The fact that the Defendants possess specific data identifying the amount of debt owed by patients suggests knowledge of the contracts between MPPs and patients. The cases cited by Defendants include allegations with less information than is provided here.  *See In re Aluminum Warehousing Antitrust Litig.,* No. 1:13-md-02481-KBF, 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014) (dismissing an intentional interference claim were plaintiff alleged that knowledge existed due to defendants' role as participants in the aluminum industry); *Trindade v. Reach Media Grp., LLC,* No. 5:12-cv-04759-PSG, 2013 WL 3977034, at *15 (N.D. Cal. July 31, 2013) (finding that

1   knowledge had not been alleged where the complaint indicated a general knowledge

2   that defendant was a party to a contract rather than allegations of specific contracts or

3   any details about the contracts).  Moreover, that the specific contracts are not

4   identified is not necessarily dispositive because "intent can certainly be inferred if the

5   defendant knows that contractual relations with a third party exist" even if "the specific

6   identity of the contractual party" is unknown.  *Sebastian Int'l Inc., v. Russolillo,* 162 F.

7   Supp. 2d 1198, 1203–04 (C.D. Cal. 2001).  Thus, the Court finds that the second

8   element has been met.

9               **3.  Intent to Interfere**

10          To show that defendants engaged in an intentional act designed to induce a

11   breach or disruption of a contractual relationship, a plaintiff must allege that the

12   interference was "known to [defendant] to be a necessary consequence of his action."

13   *Quelimane Co., v. Stewart Title Guar. Co.,* 19 Cal.4th 26, 56 (1998).

14          The SAC alleges that Defendants' alleged conspiracies

15              Removed a major incentive for patients to pay their medical
16              bills, and encouraged and persuaded patients not to pay
                their medical bills by (a) promoting a flawed rationalization
17              that medical debt is less worthy of repayment because it
                can be unexpected or incurred involuntarily, and (b)
18              indicating to patients that they no longer need to worry
19              about paying their medical bills because Defendants were
                removing the negative consequence of nonpayment.
20

21   (SAC ¶ 141.)  This is supported by allegations that Defendant's advertisements explain

22   that reporting debts cause more payment and quicker payment.  (*Id.* ¶¶ 32, 35, 74.)

23   Accordingly, the Court finds it plausible that Defendants had some understanding that

24   by eliminating certain aspects of debt-reporting, there may be a decrease in payment

25   to Plaintiff.  Thus, this element is satisfied.

26          Because Defendants do not specifically challenge the final two elements, the

27   Court DENIES Defendants' Motion to Dismiss Plaintiff Adams' claim for of tortious

28   interference with contract under California law.

1    **B.    New Jersey**

2    Plaintiff Cape Emergency Physicians brings a similar cause of action against

3    Defendants for tortious interference with existing contracts under New Jersey law.

4    The New Jersey cause of action is similar to the California cause of action.  The

5    required elements are: (1) the plaintiff must have a protected interest; (2) the

6    defendant must have behaved with "malice" – that is, the defendant must have

7    intentionally interfered with that protected interest without justification; (3) there must

8    be a reasonable likelihood that the anticipated benefit from the protected interest

9    would have been realized but for the interference; and (4) economic damage must

10   have resulted.  *Printing Mart-Morristown v. Sharp Elec. Corp.,* 116 N.J. 739, 751–52

11   (1989).

12   The Parties provide largely the same arguments as to the New Jersey tortious

13   interference claim, and the Courts analysis is largely the same.  On the issue of

14   "malice", Defendants argue that Plaintiffs have not shown that Defendants

15   intentionally sought to induce a breach of the alleged contracts.  Plaintiff argues that

16   malice exists because the alleged conspiracies are unlawful.  Here, the SAC appears

17   to acknowledge a justification for the Defendants' conduct in an effort to improve the

18   financial well-being of patients who take on medical debt unexpectedly.  (SAC ¶¶ 81–

19   82.)  However, even where a valid justification exists, such conduct cannot be

20   employed through fraudulent, dishonest or illegal methods.  Plaintiff contends that

21   the Defendants' conduct is an unlawful horizontal conspiracy.  At this stage, these

22   allegations appear sufficient to state a claim for tortious interference.

23                                    **CONCLUSION**

24   For the reasons discussed above the Court GRANTS IN PART AND DENIES IN

25   PART Defendants' Motion to Dismiss (ECF No. 73).  Defendants' Motion to Dismiss is

26   granted as to dismissal of Plaintiff Adams from the First Cause of Action and as to

27   dismissal of the Second Cause of Action.  Defendants' Motion is DENIED as to

28

dismissal of Plaintiff AmeriFinancial Solutions and as to dismissal of the Third and Fourth Causes of Action.

     IT IS SO ORDERED.

Dated:   **December 3, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC6 – ADAMS23cv01773.mtd

17